Conditionally

FILED

JUL 26 2013

CLERK, US DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

COMPLAINT UNDER CIVIL RIGHTS ACT 42 U.S.C. 1983

Action Number  2:13cv416

Please fill out this complaint form completely. The court needs the information requested in order to assure that your complaint is processed as quickly as possible and that all your claims are addressed. Please print/write legibly or type.

I.      PARTIES:
A.      PLAINTIFF:

1.   (a) Mark A. Grethen , (b) #  1174620
         (Name)                          (Inmate Number)
2.   (c) Greensville Correctional Center
         (Address)
         901 Corrections Way Jarratt, VA 23870-9614.

Plaintiff MUST keep the Clerk of Court notified, of any change of address due to transfer or release. If plaintiff fails to keep the Clerk informed of such changes, this action may be dismissed.

        Plaintiff is advised that only persons acting under the color of state law are proper defendants under section 1983. The Commonwealth of Virginia is immune under the Eleventh Amendment. Private parties such as Attorney's and other Inmates may not be sued under section 1983. In addition, liability under section 1983 requires personal action by the defendant that caused you harm. Normally, the Director of the Department of Corrections, Wardens, and Sheriff's are not liable under section 1983, just because they supervise persons who may have violated your rights. These persons are liable only if they were personally involved in the alleged deprivation. In addition, prisons, jails, and departments within an institution are not persons under section 1983.

RECEIVED

JUL 17 2013

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

B.      DEFENDANT (S):

1.   (a) Harold W. Clarke  (b) Director
         (Name)                          ( Title/ Job Description)
     (c) Department of Corrections
         (Address)
         6900 Atmore Drive Richmond, VA 23225

ANY ATTEMPT TO TRANSFER GRETHEN WILL BE SEEN AS A FORM OF RETALIATION and DELIBERATE DESIGN TO MALICIOUSLY IMPEDE HIS MEDICAL CARE, FOR WHICH DR. BU, MD NEUROLOGIST has ordered an MRI OF GRETHEN's BRAIN - as ORIGINAL APPROVAL in DECEMBER 2004 (9 years ago) NEVER OCCURRED. WHILE THIS DOES NOT CONTAIN THE MEDICAL CLAIMS, IT IS UNDISPUTABLE That NO Neurological consult occurred from 2002-2012.

2. (a) _Ms. N.H. Scott_ (b) _Deputy Director_
   (Name)                     (Title/Job description)
   (c) _Virginia Department of Corrections_

   _6900 Atmore Drive Richmond, VA 23225_
   (Address)


3. (a) _Arnold David Robinson_ (b) _Chief Corrections Operations_
   (Name)                        (Title/Job Description)
   (c) _Virginia Department of Corrections_
   (Address)
   _6900 Atmore Drive Richmond, VA 23225_

If there are additional defendants, please list them on a separate sheet of paper.
Provide all identifying information for each defendant named.

Plaintiff MUST provide an address for a complaint. If plaintiff does not provide an
address for a defendant,
   that person may be dismissed as a party to this action.

In addition, plaintiff MUST provide a copy of the completed complaint and any
attachments for each
   defendant named.

## II. PREVIOUS LAWSUITS

A. Have you ever begun other lawsuits in any state or federal court relating to your
imprisonment? _None related to conditions of confinement_
   Yes _____ No _____
   _Prior habeas corpus petitions are not subject to PLRA_
B. If your answer to A. is YES, you must describe any lawsuit, whether currently pending or
closed,
   in the space below. (If there is more than one lawsuit, you must describe each lawsuit on
another sheet
   of paper, using the same outline, and attach hereto.)

1. Parties to previous lawsuits:

Plaintiff (s) _____

Defendant's: _____

_____

2. Court (if federal court, name and district; if state court, name the country):

_____

_____

3. Date lawsuit filed: _____

## ADDITIONAL PARTY DEFENDANTS

BUT FOR CANTEEN CORRECTIONAL SERVICES, INC. and RONALD ABERNATHY, all of these following defendants are/or were employees of Virginia Department of Corrections with the Headquarters at 6900 Atmore Drive, Richmond, Virginia 23225, for which the Office of the **Virginia Attorney General, Kenneth T. Cuccinelli, II, 900 East Main Street, Richmond, Virginia 23219,** will be counsel of record for defendants. The following Virginia Department of Corrections employees are herein sued under **both their individual and official capacities.** In the event that Grethen missed some names hereon, the parties are specifically mentioned within the claims and are therefore incorporated by reference:

Gene M. Johnson, former VDOC Director; Harold W. Clarke, VDOC Director; John Jabe, former VDOC Deputy Director; Ms. N.H. Scott, VDOC Deputy Director; Louis B. Cei, Operation / Special Programs Manager / Faith Review Committe Chair; Arnold David Robinson, Chief Corrections Operations; David B. Everett, Eastern Regi. Director; Linda B. Shear, VDOC Dietitian; Mark E. Engelke, Director of Food Services; Ms. G. Robinson, VDOC Obmudsman Services Manager; Kay L. Whitehead, Regional Ombudsman; Ms. R. Woodson, Regional Ombudsman; John/Jane Doe, DOC Music Management Committee; Greensville Wardens: George M. Hinkle, Benjamin A. Wright; Tracy Ray, Mr. D. Boehm; Greensville Grievance Office: Dana K. Kinsley, Ms. D. Motley, Kay L. whitehead and Shirley Tapp; Greensville Property Officers: Sgt. Futrell and Officer Ms. Blackwell; Ms. S. A. Lawrence, Inmate Hearings Officer; Additional John/Jane Doe as discovery permits; Binwi Mfonyam, Counselor; Duane L. Taylor, Lieutenant; James Camache, VDOC Deputy Director of Community Corrections; Mr. R.H. Williams, Unit Manager; A. David Robinson/**SSG** (unknown party authorized to use his signature); John/Jane Doe, at ERO who **failed** to complete Level II intake review.

In its individual and corporate capacities:
**Canteen Correctional Services, Inc.** (presently without registered agent information)

In his individual capacity:
**Ronald Abernathy** (presently without any address information, not longer with VDOC)

## IV.   STATEMENT OF THE CLAIM

{ State here as briefly as possible the facts of your case. Describe how each defendant is
involved, and how you were harmed by their actions. You may include the names of any other
persons involved, dates, and places of events. You may cite constitutional amendments you
allege were violated, but do not give any legal arguments or cite cases or statues.

If you intend to allege several related claims, number and set forth each claim in a separate
paragraph.

( Attach additional sheets if necessary.)

Causes of Action begin on the following page.

To the Honorable Clerk of Court:

Good morning and Shalom. The claims can be derived
from the Causes of Action. I had hoped to have time to breakdown
the claims to sound bite statements. However, when battling a
CONTINUAL HEADACHE (left brain-stem to left temple) that
spikes like a circular vise with sharp (ice picks in temples
and top of head) pain and throbbing/pounding, since June 18, 2001
(12 years), it is difficult to work at times. VaDoc did not permit me
any neurological visits from October 2002 until May 2012 (10 years)
and only then after I fell and broke my left radius and ulna
bones ("shattered like egg shells"). This is NOT the medical claims.

If it pleases this Honorable Court, I would appreciate an
extension of time to future additional claims hereto this
petition. I needed to mail this presently to preserve the
issues from 2011. It was not until Winter of 2013 that I
began receiving ANTI CONVULSANTS (Primidone) to controll my
petit seizures/myoclonic jerks. This also assists my headaches;
however, my Imitrex was cancelled with return of the
resurrected Prison Health Service — now CORIZON Health

Respectfully Submitted,

4. Docket Number: _____.

5. Name of Judge to whom case was assigned: _____.

6. Disposition (Was case dismissed? Appealed? Is it still pending? What relief was granted, if any?):

_____.

### III.    GRIEVANCE PROCEDURE

*It is well Known that Grievance Exhaustion is an "affirmative defense"*

A. At what institution did the events concerning your current complaint take place?

*Greensville Correctional Center*

B. Does the institution listed in A have a grievance procedure?
   Yes **X** No ____ *But NOT in compliance with CFR Title 28, chAp I Part 40 (standards for Inmate Grievance Procedures)*

C. If your answer to B is YES:

   1. Did you file a grievance based on this complaint? Yes **X** No _____

   2. If so, where and when? *Cited within Causes of Actions*

   3. What was the result? *Some Founded, some Unfounded most NOT logged, denied intake by Regional office*

   4. Did you appeal? Yes **X** No _____

   5. Result of the appeal: *Cited within Causes of Actions Usually RUBBER STAMPING the Institutional decision*

D. If there was no prison grievance procedure in the institution, did you complain to the prison authorities?
   Yes ____ No ____ *-N/A-*

   If your answer is YES: What steps did you take? _____

   _____

E. If your answer is NO: explain why you did not submit your complaint to the prison authorities?
   *-N/A-*

*NOTE: Grethen's grievances and complaints have been "limited" to one (1) complaint and one (1) grievance weekly on six (6) occasions at GRCC - a total of FIVE HUNDRED FOURTY (540) days in less than three years. The grievance procedure is NOT in substantial compliance with the standards [CFR 28, Title I, Part 40] or is no longer fair and effective." Id., §40.16. As of July 11, 2013 GRCC complaint #'s 4749 and a pitiful 408 logged grievances. A mere 4.49% at largest facility.*

## LENGTHENING OF INCARCERATION CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Groundless Extension of Incarceration Term - Birth Certificate)

Plaintiff realleges and incorporates by reference paragraphs

1.   On March 30, 2011, Grethen was written a VaDOC, OP 861.1 Disciplinary Offense Code 119C, "Refusal to participate/obtain Birth Certificate/required Sex Offender"[1] by Defendant Binwi Mfonyam, GRCC 4 Bldg. counselor, who described the offense as follows, alleged for matters related on March 30, 2011, at 1:00 ≠PM, to-wit:

"On the above date and time offender Grethen was advised by counselor Mfonyam on several occasions to provide a birth certificate or request for one but offender refused to do so."

2.   The above cited disciplinary offense DOES NOT appear in the August 1, 2007, "Red Book" of Division Operating Procedure 861.1, Inmate Discipline, provided to VaDOC inmates, page 4 of 35, which only includes a 119a and 119b. The OP 861.1 in the GRCC S2 Law Library does not contain the 119c offense code, as it ONLY has the "Change memo 5/23/07" updates included.

3.   There is NO Divisional (i.e., Richmond HQ) Memorandum including the 119c Code in the GRCC S2 Law Library. However, there is a June 2, 2008, Memorandum 2008 - 23 Pertaining Policy: OP 861.1, contained therein, which includes the following:

119.  Refusal to participate in testing, classification, or reentry preparation:

c.  Refusal to participate in reentry planning or preparation
NOTE: Includes refusal to obtain birth certificate (unless no birth certificate exists) refusal to participate/removal from Productive Citizenship Program, etc.

d.  Refusal to participate in required sex offender registration
NOTE: Includes refusal to provide fingerprints, sign registration form, etc.

4.   Defendant Mfonyam obviously, and unlawfully, fused 119c (birth certificate) with 119d (sex offender registration), two separate and unrelated offense codes, to create her own offense: 119C, "Refusal to participate/obtain Birth Certificate/ required Sex Offender ...," NOT within Defendant G.M. Hinkle's above Memorandum.

5.   Defendant Mfonyam failed to sign, in person or electronically, the "Submitted by Reporting Officer" section of the Disciplinary Offense Report ("DOR"), original or Grethen's copy, of the "Report generated by Taylor, D L," also a defendant.[2]

5.   Plaintiff signed the DOR with the notations of "under duress" and "Demand for Monetary Extortion." He also signed the Penalty Offer,[3] which he would not accept, with the notations of "under duress" and "Threat of Monetary Extortion."[3]

7.   Plaintiff had cited, both independently to Defendant Mfonyam and within the disciplinary hearing, on April 5, 2011, before Inmate Hearings Officer ("IHO") Ms.

[2] See Exhibit A (Offense Report)     - 1 -
[3] See Exhibit B (Penalty Offer)

Lawrence, Virginia Code Section 53.1-10, in part, as Grethen's exclusion for the providing of his birth certificate to the VaDOC:

> The Director shall be the chief executive officer of the Department [of Corrections] and shall have the following duties and powers:
>
> 7. To make application to the appropriate state and federal entities so as to provide any prisoner who is committed to the custody of the state a Department of Motor Vehicles approved identification card that would expire 90- days from issuance, a copy of his birth certificate <u>if such person was born in the Commonwealth</u>, and a social security card from the Social Security Administration; (emphasis added).

"[Grethen] was [NOT] born in the Commonwealth," <u>id.</u>, of Virginia, thus excluded.[4]

8.  The legislative intent of the above statute, and related VaDOC OP 820.2, was for REENTRY PLANNING, so the RELEASED prisoners could obtain "[a] Department of Motor Vehicles approved identification card that would expire 90 days from issuance." § 53.1-10(7). Incarcerated prisoners are <u>not</u> permitted to possess a DMV Id. card, birth certificate, or social security card. See GRCC IOP 829-7.1 below.

9.  The Virginia General Assembly did not fund the mandates of Code § 53.1-10(7) for the VaDOC Director to acquire "[a] birth certificate if such person was born in the Commonwealth," in Title 32.1 HEALTH, Chapter 7, Vital Records. Nor was there funding to acquire "[a] Department of Motor Vehicles approved identification card," within Title 46.2 MOTOR VEHICLES. Therefore, the VaDOC Director shifted the cost burden to "any prisoner who is committed to the custody of [DOC]." 53.1-10(7)[5]

10.  According to VaDOC OP 820.2, REENTRY PLANNING, Section I. PURPOSE:

> This operating procedure provides for the <u>planning and provision of transitional and reentry</u> services for offenders housed in Department of Corrections (DOC) facilities. These services should provide a seamless system for <u>successful transition into their communities upon release from incarceration</u> and for improving opportunities for treatment, employment, and housing while on subsequent community supervision. (emphasis added).

While this is valid reasoning for prisoners about to be released, such reasoning does not apply to Grethen, as NO "subsequent community supervision," <u>id.</u>, avails itself for more than a decade, post-release. Therefore, there is no present valid penological interest in collecting Grethen's personal identification documents at this time, given Virginia abolished parole consideration and early release.

11.  Moreover, OP 820.2, Section VII. REENTRY PREPARATION, subsection A. Identity and Employment documents, supports NO need for long-term document storage:

> 1. To assist offenders in getting proper identity documents <u>upon release</u>, an effort will be made to obtain a valid birth certificate and social security card for each offender during their incarceration.
>
> 3. Social Security Cards - To facilitate <u>employment on release</u>, each offender should obtain a copy of their Social security card. Appli-

- 2 -

cations may be submitted to the Social Security Administration <u>within 120 days of release</u>. (emphasis added).

This would indicate that a birth certificate would not be required prior to being "within 120 days of release," <u>id</u>. #3, so as to acquire "proper identity documents <u>upon release</u>,"id. #1. (emphasis added).

12.   In conjunction with the above lack of a valid penological interest, the VaDOC OP 820.2, VII. REENTRY PREPARATION, § 6. Offender Discharge Identification, has a lesser restrictive procedure already in place, to-wit:

    a. Facilities shall issue the Offender Discharge Form to all offenders on release. This form may help the offender cash checks, obtain housing, and access transportation; however, it <u>will not be accepted by the D[ivision of Motor Vehicles] as proof of identity for an ID</u>.

    b. Discharged offenders should take the Offender Discharge Form to the Local P&P Office to be issued Offender Information Form.

      i. ...

      ii. The Offender Information Form <u>will be accepted by the DMV</u> as a primary proof of residency and as a secondary proof of identity.

      iii. The Offender Information Form <u>will also be used by facilities in lieu of the Offender Discharge Form</u> for offenders who are transferred to local jails for Work Release or Pre-Release programs.

      iv. ... (emphasis added)

This would indicate that a birth certificate would not be required <u>AT ALL</u>, as the Offender Information Form and the social security card "will be accepted by the DMV," <u>id</u>., b. ii, to acquire "[a] Department of Motor Vehicles approved identification card that would expire 90 days from issuance," Code § 53.1-10(7), for the "[p]roper identity documents <u>upon release</u>," OP 820.2, § VII., A. #1. (emphasized) [6]

13.   Grethen presented, or attempted to present (cut off by IHO Lawrence), above stated facts, law, policy and procedures, to no avail, at the March 5, 2011, 119C disciplinary hearing at GRCC, where he was found guilty based solely on UNTRUTHS by Defendant Binwi Mfonyam, the Reporting Officer, and OP 820.2, resulting in the <u>punishments</u> of OP 820.2, § VIII., A., 2. Birth Certificates:

    d. Offenders who are required to obtain a copy of their birth certificate but refuse to make a reasonable effort shall be charged with Offense Code 119c, Refusal to participate in reentry planning or preparation.

      i. Offenders found guilty of Offense Code 119c shall have a <u>Mandatory</u> penalty of 90 Days Loss of Accumulated Good Time.

      ii. Offenders found guilty of Offense Code 119c shall receive a formal hearing by the ICA to be reduced to good time Class Level IV until they comply with requirements for Birth Certificates.

Defendant Lawrence, IHO, pronounced both "[a] Mandatory penalty of 90 Days Loss of Accumulated Good Time" and the ICA referral during the tape recorded hearing. See Exhibit B (Hearing Report).

14. On April 7, 2011, Grethen wrote to Defendant S.A. Lawrence in support of his allegations of Defendant Mfonyam's UNTRUTHS which included copies of a response to a prior Informal Complaint (March 2, 2011) and computer dated documents (March 8th) that evidenced the request was backdated. The following was not responded to, or included in the appeal package, by Defendant Lawrence:[7]

> Good morning. It is impossible to overcome the spoken word of a person who can not be truthful in her written word. Attached is a March 2, 2011, response to I/C # GCC-11-INF-01266 stating "Attached are copies of your sheets you demanded," which I received on April 9, 2011. However, the attached copies were not printed until 3/8/11 at 11:29AM (S/L Reclass) and 3/8/2011 at 11:30 (Class Level Eval). If Binwi Mfonyam can not be truthful about backdating (6 days) her written word, then why be truthful in spoken word? cc: to file." (typed from carbon copy, emphasis in original).

15. Grethen had asked Defendant Mfonyam, within the tape recorded hearing, "What part of 'Thou shalt not bear false witness' don't you understand?" This was asked on three occasions.[8]

16. Grethen maintained throughout that Defendant Mfonyam only asked him about his birth certificate once, more than a month prior, at which time he showed her Code § 53.1-10(7), with emphasis on "a copy of his birth certificate is such person was born in the Commonwealth." NOTHING else was said after that time to him about his birth certificate, much less any conversation on the topic on March 30, 2011, at 1:00 PM, while video evidence will show he was in his cell, with his jacket and a pillow blocking the window because he was using the toilet.

17. Grethen also maintained that the 119c charge has a built in defense ("unless no birth certificate exists"), which he invoked, as he has never owned his birth certificate. VaDOC/GRCC defendants have made no attempts of their own to refute non-existence, as defendants have not applied for the public New York State birth certificate at their own expense. Notwithstanding, Va Code § 53.1-10(7) bars the jurisdiction of VaDOC/GRCC, as New York is outside of the bounds of "[i]f such person was born in the Commonwealth." (emphasis added)[9]

18. Grethen was not asked "Do you wish to appear at the Disciplinary Hearing?," when the 119C DOR was processed, as there is no responses in the Yes; No; or the Refused to Respond boxes. The charging document also reflects that Grethen wanted a Staff Advisor and he "Refuse[d] offender advisor," who was hostile towards him.[10]

19. Defendant Duane L. Taylor told Grethen that he had to select and provide his own staff advisor, to which Lt. Purrington agreed. Lt. Purrington reviewed both the 119C DOR and Va. Code § 53.1-10 with Grethen in preparing a defense. He also advised Grethen on writing requests to the IHO to reflect his inability to acquire Witness Request Forms and Request for Documentary Evidence Forms in Building 4, as these were due process violations.

- 4 -

20. Lt. Purrington also stated that the failure for the Reporting Officer (Ms. B. Mfonyam) to sign the 119C DOR was in itself a due process violation worthy of the dismissal of the charge. This implies that he too was unaware of the Memorandum in regards to electronic signatures, supra, which is also not in the GRCC S2 compound Law Library for inmate review. Nor is it posted on Housing Unit 4 bulletin boards.

21. As mentioned above, the S2 Law Library does not have a complete DOP 861.1. It only contains the 5/23/07 change memo. Therefore, Grethen requested the following:

> DOP 861.1 (Inmate Discipline) with ALL available updates / Memorandums / Attachments / Divisional; Regional; and local GRCC

It is noteworthy that the Attachments are not in the <u>Inmate Discipline</u> (Red Book), and stop at number 14 in the Law Library. There is no memorandum extending 861.1 expiration of August 1, 2010, per section XXXII. REVIEW DATE ("This procedure shall be reviewed annually by the office of primary responsibility and <u>re-written no later than August 1, 2010</u>. (4-4227)." (emphasis added)

22. While Defendant Lawrence had shown Grethen her copy of DOP 861.1, including a number of updates into 2011, just prior to the hearing, even her personal copy had failed to include a single Attachment. Furthermore, it can not be said that a copy <u>ONLY</u> contained within her working documents as the Hearings Officer is posted in a public location for access to inmates at GRCC. Not only had this hindered Grethen in his defense at the April 5, 2011, hearing, it continued to hinder him in making a full and complete appeal to the guilty finding of the 119C DOR.

23. Lt. Purrington was not available at the time of the April 5, 2011, hearing. Defendant Lawrence attempted to appoint the previous Inmate Advisor that Grethen originally dismissed for disrespect. The Inmate Advisor was more interested in the witness, Billy Joe Brown, and became confrontational with Grethen. This led to his second dismissal as Grethen's Inmate Advisor. See <u>Robinson Response</u>, p. 4, para. 12.

24. Grethen requested, as he was being forced to have an Inmate Advisor, to have Terrance Plummer from Housing Unit 6 (also S2) as the Inmate Advisor. Defendant S. A. Lawrence refused to have Plummer called over. In short, the hearing proceeded without Grethen having either a Staff or Inmate Advisor. Both Defendant Lawrence and Grethen commented upon this due process failure on the hearing tape.

25. A careful review of the end of the hearing tape, unless edited out on the MP3 device, will clearly show that Defendant S.A. Lawrence, IHO, offered to turn tape off for Grethen to complete a (yet unprovided) New York City[*] application for the birth certificate, prior to pronoucement of punishment. Grethen directly asked her of her intent and further charged her with strongarming him, through threatening to extend his term of incarceration for a birth certificate he did not want; could not possess; and did not need. See <u>Robinson Response</u>, p. 6, para. 23.

[*] Different from balance N.Y. State

26.  On April 28, 2011, Grethen received his appeal package to the 119C DOR, which had been granted Institutional Review by Defendant R.H. Williams (included in some other claims herein), then Housing Unit 10 Unit Manager, on April 6, 2011, with a punishment of "Loss of SGT up to 90 Days - Imposed Value: 90 Days," on Page 2 of 3 of Case # GCC-2011-0796. It appears to be signed without review.

27.  Errors within Page 2 of 3 (no page 3 included) are as follows, all of which are in violation of DOP 861.1, to-wit:

  - The time of the April 5, 2011, hearing was "12:00AM" in violation of DOP 861.1, § XI, B. #2 ("Service of the disciplinary report should not occur between the hours of midnight and 6:00AM ...")(sleep period).

  - There is no entry of a Plea, as Guilty; Not Guilty; No Plea are BLANK. Offender's Signature contains "NA" rather than Grethen's signature. See DOP 861.1, Attachment # 8, Stage I, E.

  - "Was the Reporting Officer present at the hearing?" NO. See DOP 861.1, § XVI, B. #1 ("For Category II offenses, testimony by the Reporting Officer shall be in person," even at mid-night).

  - "Was there a denial of requested Witnesses? and/or Documentary Evidence?" fail to have Yes or No checked within either of the four boxes. Further, Part II - Hearings Officer's Review on the two Resuests For Documentary Evidence and one Witness Request Form, attached to the appeal package, have never been completed. This combination violated "If yes, refer to the Witness Request Form or the Documentary Evidence Request Form for the reason why the request was denied," Page 2 of 3, and Attachment #8 (Stage I, H; STAGE II, D - F). See also DOP 861.1, § XV, A. #1(a) and # 2(a), in Responsibilities of the Hearing Officer Prior to Hearing.

28.  It is obvious from the above errors within the 119C, Case # GCC-2011-0796, that Grethen did not receive a fair, unbiased, accurate and complete Institutional Review, on April 6, 2011, from Defendant R.H. Williams, who has previously written false statements concerning the withholding of Grethen's legal materials while he was held in Housing Unit 10, under Williams' charge. Additionally, R.H. Williams failed to have moved Grethen prior to him being assulated by former cell assigned occupant, Rodney Williams, while housed under R.H. Williams in S1 compound. These two claims are covered elsewhere in this legal action.

29.  The consequences of the errors are not harmless, as Grethen has state created liberty interests in retaining his previously earned and banked sentence credits. See Wolff v. McDonnell, 418 U.S. 539, 556-57 (1974)(good time credit accrued under state law is liberty interest protested by the 14th Amendment's Due Process Clause)

30.  The arbitrary and capricious removal of Grethen's previously earned sentencing credits, under the guise of "REENTRY PLANNNING" (a decade prior to release) for the failure to provide an out-of-state birth certificate (not authorized by Va. Code § 53.1-10(7)) violates the Eighth Amendment of the United States Constitution, as (1) fourteen (14) days of immediate extension of incarceration is "a serious deprivation

- 6 -

of a basic human need" and (2) "deliberate indifference to prison conditions on the part of prison officials." <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir. 1993).

31.  Upon Grethen's next annual review, in December 2011, he will be subjected to a removal of his ESC Level I (4.5 days monthly) and assignment of ESC Level IV (0 days monthly), for an extension of his incarceration by Fifty-Four (54) days annually. This will continue until Grethen submits to the overbroad VaDOC OP 820.2 (REENTRY PLANNING) and provides his out-of-state (New York) birth certificate. Given present release date, 2024 (at ESC Level I) the extension could add two (2) years. See the <u>Fifth Cause of Action</u> (Retaliation) for ESC loss calculations.

### State Created Statutory Liberty Interest in Earned Sentence Credits

32.  Virginia Code section 53.1-202.2, Eligibility for Earned Sentence Credits, is a mandatory ("shall") state created liberty interest, to-wit:

> Every person who is convicted of a felony offense committed on or after January 1, 1995, and who is sentenced to serve a term of incarceration in a state or local correctional facility <u>shall</u> be eligible to earn sentence credits in the manner prescribed by this article. Such eligibility <u>shall</u> commence upon the person's incarceration in any correctional facility following entry of a final order of conviction by the committing court. As used in this chapter, "<u>sentence credit</u>" and "<u>earned sentence credit</u>" mean deductions from a person's term of confinement[.] ... One earned sentence credit <u>shall</u> equal a deduction of one day from a person's term of incarceration. (1994, 2nd Sp. Sess.)(emphasis added).

33.  Virginia Code section 53.1-202.3, Rate at Which Sentence Credits May be Earned; Prerequisites, is also mandatory ("shall") in state created liberty interest:

> A maximum of four and one-half sentence credits may be earned for each thirty days served. The earning of sentence credits <u>shall</u> be conditioned, in part, upon full participation in and cooperation with programs to which a person is assigned pursuant to § 53.1-32.1. (1994)(emphasized).

34.  Grethen was incarcerated on March 8, 2001, and was earning the highest rate of "four and one-half sentence credits," <u>id</u>., prior to the April 5, 2011, conviction the VaDOC OP 861.1, 119(c), disciplinary offense (itself far-reaching beyond § 53.1-10(7) in-state birth authority). Therefore, he had a vested interest in maintaining his previously earned and banked ESC, in addition to retaining the highest earnings rate for future credits.

35.  Furthermore, it is proffered that refusal to provide an out-of-state (New York City) birth certificate is <u>NOT</u> equal to failure of "full participation in and cooperation with programs to which a person is assigned pursuant to 53.1-32.1," Va. Code § 53.1-202.3, as Grethen was <u>NOT</u> "refusing to accept a program assignment," § 53.1-32.1(D), given Grethen's scheduled reentry is more than a decade away. Hence, providing a copy of a birth certificate for acknowledged REENTRY PLANNING is not a "program ... assigned pursuant to 53.1-32.1," per Va. Code § 53.1-202.3.

- 7 -

## Feeble Safeguards to Protect Against Unjustified Deprivations

36. Having established that Grethen had a state created liberty interest in both earning and maintaining his previously Earned Sentence Credits ("ESC"), so as to obtain a speedier release (i.e., avoidance of cruel and unusual punishment), it is necessary to examine the three-part test of Lovelace v. Lee, 472 F.3d 174, 202 (4th Cir. 2006)(to succeed on due process claim, inmate must show (1) denied protected liberty interest, which (2) caused atypical or significant hardship, and (3) had constitutionally inadequate procedural safeguards). 40 Geo. L.J. Ann. Rev. Crim. Proc. 1038, n. 3069 (2011).

37. The above (sometimes winded) paragraphs within this Cause of Action, set forth the details required to support a procedural due process claim related to removal of Plaintiff's ESC resulting in an extension of incarceration (somewhere between a period of 14 days - 2 years), as all three elements within Lovelace v. Lee, supra, and its subsections, are satisfied, to-wit:

  i. Grethen was engaged in a protected liberty interest, created by Code of Virginia 1950, as amended, § 53.1-202.2 (1994) and § 53.1-202.3 (1994), of which relevent portions appear on previous page, for the creation of (and rate of) Earned Sentence Credits. Further, Grethen had a property interest, created by Code of Virginia, as amended, § 53.1-10(7) and the Fourth Amendment to United States Constitution, in withholding his out-of-state (New York, N.Y.) birth certificate from the VaDOC, as Grethen was NOT "[a] person ... born in the Common-wealth," as required by § 53.1-10(7). See Second and Third Causes of Action (Seizure and Taking).

  ii. By intelligent and intentional design (to prolong imprisonment) both defendants John M. Jabe ("Jabe"), Deputy Director of Operations, [f] and James R. Camache ("Camache"), Deputy Director Community Corrections, created Operating Procedure ("OP") 820.2 (REENTRY PLANNING) and OP 861.1 (INMATE DISCIPLINE), signed by Jabe), for placing in force the punishment, OP 861.1, § V (A)(119(c))(refusal to obtain birth certif-icate), resulting in immediate loss of ESC ("Mandatory Penalty of 90 Days Loss of Accumulated Good Time") and future loss of the sentence credits ("reduced to good time Class Level IV until they comply with requirements for Birth Certificates"), OP 820.2, § VII (A)(2)(d)(i & ii). These procedures are overbroad and far reaching beyond the law, as established by Va. Code § 53.1-10(7)("born in the Commonwealth"), resulting in "atypical or significant hardship," Wilkinson v. Austin, 545 U.S. 209 (2005), through an unwarranted and wanton extension of Grethen's imprisonment by between fourteen (14) days and two (2) years.

  iii. The following must be considered when considering the constitutionally inadequate procedural safeguards: "(1) the private interest affected by the government action; (2) risk of erroneous deprivation through the procedures used and the probable value, if any, of alternative or additional procedures; and (3) the state's interest, including the function involved and the fiscal and administrative burdens of added safeguards." Lovelace, 472 F.3d at 202.

[f] John M. Jabe has been replaced by N. H. Scott as Deputy Director.

1) Grethen has a recognized legal and "private interest" in protecting his personal identification documention from being seized and held by the VaDOC for more than a decade. Especially when acknowledging the out-of-state (and in-state) birth certificates are required for REENTRY PLANNING, OP 820.2, to acquire "Department of Motor Vehicles approved identification card," Va. Code § 53.1-10(7), post-release. The VaDOC attempts to justify the Birth Certificate compulsion with the following:

> Without a photo ID, which can only be obtained with an original copy of a Birth Certificate and Social Security Card, offenders will NOT be able to:
>
> a. Stay in a homeless shelter
>
> b. Enter federal agencies (including the Social Security Administration to apply for SSI, SSDI and other benefits)
>
> c. Receive services from a Community Service Board (for mental health and substance abuse services)
>
> d. Travel on a bus, plane, or train
>
> e. Get a job
>
> f. Cash a check
> - OP 820.2, § VII, A, # 5 (Reentry Preparation)

Respectfully, Grethen is incapable of partaking in any of the above stated activities until he is released from VaDOC custory. As such, there is no valid penological interest in calling for a certificate of birth years prior to release. The VaDOC policy, ibid. # 5, which requires "applications may be submitted to the Social Security Administration within 120 days of release," illustrates a rationally sound approach equally germane to Birth Certificates. What's more, is the outlandish economic waste (appx. $30,000 annually for each prisoner) for extending the term of incarceration for withholding a Birth Certificate that the inmate can not possess (protect) or use for any of the above, post-release, activities. Therefore, Grethen has a "private interest" that outweighs published reasons presented by the VaDOC. See also Fifth Cause of Action (various laws cited).

2) The "risk of erroneous deprivation" must be weighed multiplefold, as there is a risk to Grethen that his personal documents could be used for criminal identity theft purposed, see Va. Code § 18.2-186.3 and § 18.2-186.4, in violation of the federal Privacy Act of 1974, Public Law 93-579, 88 Stat. 1905 (12/31/1974), etc. A greater, and unnecessary, risk is NOT "erroneous," but wanton and malicious by intentional design, that of extending Grethen's imprisonment for a failure to produce a Birth Certificate fourteen (14) years prior to a scheduled release date (for post-release purposes), in violation of statutory law, § 53.1-10(7), as applied to out-of-state births. See Second Cause of Action (noting pre-incarceration protection of Grethen (and son) identification documents).

The "alternative or additional procedures" requirements are set forth, from existing VaDOC policy, OP 820.2, in detail within the Fourth Cause of Action (Violation of Federal Privacy Act) herein, through "the Offender Information Form [that] will be accepted by the DMV as a primary proof of residency and as a secondary form of identity," OP 820.2, § VII, A, # 6(b)(iii), as issued by VaDOC.

Moreover, and again, the fact that "applications may be submitted to the Social Security Administration within 120 days of release," OP 820.2, § VII, A#3, authenticates that "reentry" documentation is not necessary until just before "release." Not decades prior. See Fifth Cause of Action (Retaliation for Engaging in Protected Conduct)

Nonetheless, Defendant Robinson proffers that "the only exception to this is for those offenders who are on death row," Regional Appeal Response, p. 4, para. 13, yet not exempting "life without possibility of parole" that will also die in prison with "bodybag release" or the prisoner sentence of more years than natural life expectancy.

3) The Plaintiff humbly proffers that, other than filling the coffer of the Commonwealth of Virginia with funds provided from inmates "born in the Commonwealth," Va. Code § 53.1-10(7), there is neither "the state's interest [or] function" in collection of birth certificates, for published "REENTRY" purposes, decaded prior to release or from inmates that will never be released.

There would be no "administrative burdens of added safeguards" in delaying the collection of the birth certificates to "within 120 days of release," 820.2, § VII, A#3, or other benigh date shortly before a physical "live" release from incarceration. This would reduce the administrative costs (and liability) of supervising, maintaining and ultimately destructing collected birth certificates of those destine to die within the prison walls.

At the same time, any profits from in-state birth certificate sales is offset by the unprofitable expense of extending prison terms, at approximately Thirty Thousand ($30,000) Dollars annually, connected to those prisoners (like Grethen) who refuse to acquire a certificate of birth until nearer their release date.

38. Finally, the defendants, from John M. Jabe, VaDOC Deputy Director (the OP 820.2 and OP 861.1 signatory party), downward, have failed to propound any allurement for collection of birth certificates, other than "REENTRY," much less for extention of imprisonment (via lost good time) of out-of-state births exempted by statute. This above conduct (and policies related thereto) is without valid penological interest, designed to coerce (under duress) Grethen into violating statutory requirements of Va. Code § 53.1-10(7)("if such person was born in the Commonwealth").

FIRST CAUSE OF ACTION FOOTNOTES

1 Robinson conceded "that an invalid title was originaly entered into VACORIS for this particular [119c] offense code." Regional Appeal Response, p. 2, para. 1.

2 Robinson proffers that "per Memorandum dated January 10, 2011, … VACORIS has changed some aspects [thereby] the Reporting Officer is no longer required to sign the Disciplinary Offense Report." ibid, p. 3, para. 3. Not only has Grethen never seen the January 10, 2011, Memorandum, the failure of the Reporting Officer to sign the DOR is not supported by the newly published DOC OP 861.1, Offender Dicipline, Institutions, September 1, 2011, which has the new VACORIS changes. No such specific "signatory" exemption for a Reporting Officer (initiator of "ticket") exists.

- 10 -

3 While Robinson avers "you provide no evidence to support this particular contention in that you were under duress," ibid p. 2, para 2., he demands that "if submitting $30.00 to the Office of Vital Records in New York is part of the process ... you are required to do so ... subject to the penalty of 90 days loss of good time." Id. Summarily, if this does not amount to duress (i.e., pay or be punished), then what does? Further, "offenders who have insufficient funds will be given a [FORCED] loan by the [DOC]." Ibid p. 5, para 16, Exhibit E.

4 Robinson proposes that "your quotations from other Virginia Codes are irrelevant ... as O[P] 820.2 ... includes providing a copy of your birth certificate ... no matter which state you were born in," ibid p. 4, para. 9, thereby exceeding authority of Va. Code § 53.1-10(7). Overbroad!

5 Robinson failed to directly address the lack of funding for the in-state birth certificate requirements, and shifted the financial burden to the Plaintiff and "[his] home which would have been no cost to you," ibid p. 5, para. 16, whereby a $30.00 fee would still be required by New York.

6 Robinson totally evaded the "lack of a valid penological interest" or that the SS Card is not required until "within 120 days of release." Regional Appeal Response, p. 2, no. 29, and p. 6, para. 29 ("this particular contention is irrelevant [as] you were not charged with failing to obtain your social security card ..."). See Exhibit E.

7 Robinson admitted that "Mfonyam signed ... on 3/2/2011 and printed ... 3/8/2011. However, the response was not due until 3/9/2011." Ibid p. 4, para. 10. When the materials were due is of no matter. See Exhibit E.

8 Robinson asserts "this particular contention is irrelevant to this charge ... both inappropriate and unnecessary." Ibid p. 5, para. 19. It is relevant, given that Mfonyam had spoken to Grethen only once (months prior) about the birth certificate, at which time Grethen produced Va. Code § 53.1-10(7)(an out-of-Commonwealth exemption), and they NEVER discussed matter again.

9 See ibid p. 5, para. 20, and footnote 9 ("codes are irrelevant"). Exhibit E.

10 The same "hostile" offender advisor adamantly pushed that Grethen provide a copy of his birth certificate to have avoided the disciplinary action when originally served. His position had not changed between service and hearing. See next paragraph and Regional Appeal Response, p. 4, para. 12, Exhibit E.

11 Defendant Dana Y. Kinsley, GROC Law Library Supervisor, provided the S2 Law Library with a copy of OP 861.1 with "Change memo 5/23/07 added" only. The Attachments only went through number 14, of which all were "Effective Date: August 1, 2007," failing to comply with various interim memorandums. i.e., 2008-3 Pertaining Policy: OP 861.1, "O[P] 861.1, Attachment #15, Hearings Officer Code of Ethics, added," effective 4/1/08 (Hinkle); 2010-117 OP 861.1 "O[P] 861.1, Attachment 8, Format for Disciplinary Hearings, revised," and "O[P] 861.1, Attachment 9, Disciplinary Appeal, revised," effective 12/1/10. There is no January 10, 2011 or June 10, 2011, memorandum from John M. Jabe in the S2 Law Library, nor where any of these provided by IHO Ms. Lawrence at the hearing. Further, there are NO date-stamps on the scant memorandums to verify when the limited change documents were actually (if ever) placed in the S2 Law Library. In short, no complete CURRENT OP 861.1 rules and/or regulation were provided Grethen at GROC, See Wolff v. McDonnell, supra, prior to the April 5, 2011, hearing.

- 11 -

## SECOND CAUSE OF ACTION
### (Unwarrantable Search and Seizure - Birth Certificate)

Plaintiff realleges and incorporates by reference paragraphs

1.  Plaintiff fully acknowledges that his birth certificate is a public record of the State of New York, for which he does not have absolute and exclusive rights to prohibit the Director of the Virginia Department of Corrections from acquiring a copy of said birth certificate at the VaDOC's expense.[1]

2.  Notwithstanding the above ability of the Director to acquire Grethen's birth certificate from the State of New York, the Virginia General Assembly limited the Director's authority to "[a] copy of [Grethen's] birth certificate if [he] was born in the Commonwealth," Va. Code § 53.1-10(7), of Virginia. Furthermore, there is no authorized funding for acquisition of out-of-state birth certificates.[2]

3.  Given the lack of legislative authority and funding, Defendants John M. Jabe, Deputy Director of Operations, and James R. Camache, Deputy Director of Community Corrections, wrote and/or authorized VaDOC OP 820.2 REENTRY PLANNING, outside of (i.e., overbroad and far-reaching) the bounds of Va. Code § 53.1-10(7), so as to encompass all VaDOC prisoners, while burdening them with the expenses.[3]

4.  Consequently, given that the individual prisoner must make application for a birth certificate, at his/her expense, it would be logical to conclude that the ownership of that specific birth certificate document is credited to the prisoner, with the full rights of the Fourth Amendment to the federal constitution.

5.  Defendants Jabe and Camache are without scruples and unapologetic, as to the burden of expense for the birth certificate being placed on the prisoner, if when the prison is without any financial income, such as Grethen, to-wit:

> ii. **Offenders will be charge a fee** as designated by the Office of Vital Records of the state for which the request is being made to for the Application for Birth Certificate.
>
> iii. For offenders who have insufficient funds to cover the cost of the Application for Certificate of a Vital Record, <u>a loan will be given by the DOC</u> to cover the cost as required by the applicable state.

- OP 820.2, VII. REENTRY PREPARATION, A.,#2 (b)(emphasis added).[4]

Regardless, once forced to pay for the birth certificate, the prisoner is not permitted to possess his own personal identification documents, to-wit:

> 4. Once the Birth Certificate or Social Security Card is received by the facility, <u>it shall be placed in the offender's Institutional Criminal Record</u>. The offender will be given the Birth Certificate and/or Social Security Card at the time of release, and should sign a receipt that will be placed in the Institutional Criminal Record. <u>If the documents are received after the offender is released</u>, they may be forwarded by certified mail or staff courier within 30 days of receipt to any DOC facility or staff responsible for the offender's supervision.

- OP 820.2, VII. REENTRY PREPARATION, A.,#4(emphasis added).

6.   It is lamentable that inmates are easy prey for identity theft victimization, as an extended term of incarceration wipes away bad credit reporting, and inmates are usually unable to afford protection and alerting services related to various kinds of credit activity. Therefore, there is a valid concern for inmates to limit the availability of their personal identification documnets to secure sources.

7.   Worse, it is disadvantageous when the Virginia Department of Corrections, at the Greensville Correctional Center, is incapable of securing an inmate's personal identification documents, which may assist in identity theft, as set forth within the Sworn Affidavit of Robert E. Bignall ("Bignall"), former Id. No. 1145425, who provided GRCC staff with three (3) copies of his birth certificate, from the State of California, between his November 8, 2008, arrival at GRCC, and his April 12th, 2011, departure therefrom. See Bignall Affidavit (4/11/11), Exhibit

8.   Grethen has never owned a copy of his birth certificate, has never previously been asked to provide his birth certificate as a form of identification (prior to his incarceration), and has never had the desire to apply for a copy of his birth certificate, which may or may not be from the State of New York, given that other available medical records indicate his parents were living in New Jersey at the time of his birth. These records are presently being withhold by GRCC defendants, as authorized on Level II grievance appeal by Defendant A.D. Robinson.

9.   By the same token, Grethen does not freely distribute or publish his federal Social Security Administration number. Grethen campaigned for the removal of Social Security numbers from Virginia drivers licenses, as utilized by the DMV, given it was a violation of the Federal Privacy Act. Grethen's DMV license had an assigned T- number. Nor did the SSN appear on Grethen's personal or corporate checks.

10.   Furthermore, former Governor and Attorney General, respectively, Jim Gilmore and Mark Early, had reprimanded the Suffolk School Board for threatening to expel Grethen's then 4-year old son for failure of Grethen to provide his son's federal SSN. Pre-incarceration, Grethen did not provide his SSN to medical providers and insurance companies. However, VaDOC and Prison Health Services, without Grethen's consent, have provided his SSN to dentists, doctors, hospitals, lab technicians, oral surgeons, and other external VaDOC health services providers.

11.   In short, while it may be argued that Grethen's birth certificate is a public record of the State of New York (or possibly New Jersey), when the VaDOC places an expense burden upon Grethen to provide a specific copy of his birth certificate to the VaDOC, then that specific document befalls the adage "possession is 9-tenths of the law," along with all of the Fourth Amendment protections thereto. Yet the VaDOC is strongarming and proposing seizure of unwanted birth certificate.[5]

- 13 -

12.  Defendants Jabe and Camache have failed to demonstrate a valid penological interest in collecting and retaining Petitioner's out-of-state birth certificate more than a decade prior to his scheduled release from prison. However, Grethen has presented, both pre- and post-incarceration, legitimate and legal concerns in protecting his personal documentation / information that could <u>potentially</u> result in uses of identity theft of his persona.[6]

13.  Defendants Jabe and Camache have acknowledged that it is not necessary for an inmate to provide either the birth certificate or the social security card prior to release from prison. VaDOC OP 820.2, § VII, A#4 ("If the documents are received after the offender is released, they may be forwarded by certified mail or staff courier within 30 days of receipt to and DOC facility ...").

14.  Defendants Jabe and Camache have quelled any reasonable requirement argument for the advance collection of birth certificates based on the minimal requirement to apply for the social security card. VaDOC OP 820.2, § VII, A#3 ("Applications may be submitted to the Social Security Administration <u>within 120 days of release</u>") (emphasis added). See Regional Appeal, p. 6, para. 29 (deflecting comparison).

15.  Defendants Jabe and Camache have abated any need whatsoever for requiring the Petitioner's birth certificate or social security card, given that "[t]he <u>Offender Information Form</u> will be accepted by the DMV as a primary proof of residency and as a secondary proof of identity [and the] <u>Form</u> will also be used by facilities in lieu of the <u>Offender Discharge Form</u> ...," OP 820.2, § VII, A#6(b)(ii) and (iii).

16.  Defendants Jabe and Camache have acknowledged their intent to seize Grethen's birth certificate the moment it arrives at any VaDOC facility, given that "[o]nce the Birth Certificate or Social Security Card is received by the facility, it shall be placed in the offender's Institutional Criminal Record," OP 820.2, § VII, A#4, which Bignall's Affidavit illustrates is <u>not</u> a secure place at GRCC.

17.  Defendants G.M. Hinkle and A.D. Robinson (for former Regional Director, Rufus Fleming) have conspired with Defendants Jabe and Camache in plans to seize identity documentation belonging to Grethen, were they to be sent to GRCC, as "[t]hese items are not to be possessed by inmates during incarceration." IOP 829, 829-7.1, cl. 3.

18.  Grethen has a Fourth Amendment "[r]ight ... to be <u>secure</u> in [his] person[ and] papers, and effects, against unreasonable ... seizures," through strongarming him to acquire a birth certificate (which he does not want, need, or can possess) for the expressed intentions of the above defendants to seize upon receipt at VaDOC / GRCC.[7]

19.  That Grethen has been strongarmed is evidenced by the "Loss of SGT up to 90 Days - Imposed Value: 90 Days" by Defendants S.A. Lawrence and R.H. Williams, for the 119c Offense ("[r]efusal to obtain birth certificate"), on March 5, 2011.[8] See Exhibit B.

20. Moreover, Defendants have not provided a rationale for extending Grethen's term of incarceration by 14 Days, through the removal of previously earned good time / sentencing credits, for failure to obtain a birth certificate, given that his release date is 2024. This 90 Day ESC waste will result in a reduced Class Level assignment for Earned Sentence Credits ("ESC"), thus further extending the term of Grethen's incarceration well beyond the initial 14 Days.

21. The arbitrary and capricious conduct of the Defendants as described above, without adequate penological justification, violates Plaintiff's Fourth Amendment and due process rights.

22. As a direct and proximate result of the aforesaid conduct of Defendants, the Plaintiff will suffer a continued and unlawful term of extended incarceration and said incarceration will result in Plaintiff suffering financial injury.

## SECOND CAUSE OF ACTION FOOTNOTES

[1] Robinson conceded that VaDOC is unable to acquire my New York, New York birth certificate as, "only [Grethen is] able to fill in that particular part of the application." Regional Appeal, p. 4, para. 13.

[2] Robinson asserts that OP 820.2 presides over Va. Code § 53.1-10(7), arguing [Grethen's] quotations from other Virginia Codes are irrelevant." Id, para. 9.

[3] Robinson conceded an unwritten OP 820.2 noninclusion, as "only exception to this is for those offenders who are on death row." ibid., para. 13.

[4] Robinson asserts that Grethen should place the burden of expense on others, as [a] copy of your birth certificate [could come] from your home which would have been no cost to your," ibid. p. 5, para. 16, or receive "[a FORCED] loan from by the [DOC] in order to cover the cost," Id., thus verifying a cost. VaDOC's FORCED cost, directly or by proxy (punishable an extended term of imprisonment for failure to comply) meets the elements of extortion. Va. Code § 18.2-59, etc. See also Regional Appeal, p. 6, para. 33 ("[a]t no point in time were being extorted for money.").

[5] Robinson claims "there is no indication that you were strong-armed by her [with] threats of extending your incarceration," ibid, para. 23, yet confirms there is "mandatory penalty [of] 90 days loss of good time [extending] your time within the [VaDOC]. Id. See Fifth Cause of Action (Retaliation).

[6] Robinson has failed to refute that both Va. Code § 53.1-10(7) and OP 820.2 are NOT intented for collection of "birth certificate[s] more than a decade prior to [a] scheduled release from prison, as ALL of Robinson's responses refer to REENTRY. Id., p. 2, para. 1; p. 4, para. 9; p. 5, paras. 14-17 & 20; and p. 6, paras. 25, 29, 31-32.

[7] Robinson asserts "[a]t no time have your fourth amendment rights ... been violated in ... attempting to obtain a copy of your birth certificate," ibid p. 6, para. 33, yet conceded, "[OP] 820.2 requires all offenders['s ...] birth certificate[s are] not kept as their personal property," id., para. 25, in offender's possession. (emphasis added). Hence, seized upon arrival is future 4th Amend. violation.

- 15 -

8 Defendant S.A. Lawrence, on tape at the hearing, offered to turn off the recording device so that Grethen could complete a yet unprovided form for birth certificate. Grethen was unable to get her to describe her intent on the recording. However, it is obvious that if (actually when) Grethen failed to submit to providing the birth certificate, then Lawrence would punish Grethen through loss of good time credits. Had Grethen submitted, Lawrence would have found him not guilty, as stated off recording after the hearing. Hence, strongarming and duress are implied.

9 See Fifth Cause of Action (retaliation), citing the elements of Suarez Corp. Indus. v. McGraw, elements (3) for calculation of extended prison term, from fourteen (14) days upwards of two (2) years.

10 The financial injury would include upwards of two (2) years employment and / or Social Security benefits (disability or retirement) income, post-release, as "Mark A. Grethen [was] permanently incapacitated prior to age twenty-one." See Exhibit K (Department of the Navy letter, August 8, 1988).

- 16 -

## THIRD CAUSE OF ACTION
### (Taking By Undue Exercise of Power - Birth Certificate)

Plaintiff realleges and incorporates by reference paragraphs

1.   As previously stated within the above two causes of action, Defendants Jabe and Camache, have created VaDOC OP 820.2 REENTRY PLANNING, outside of the intent of Virginia Code Section 53.1-10(7), so as to financially burden the prisoners for the cost of their, in many cases unwanted, birth certificate.[1]

2.   It has also previously been established above that Code § 53.1-10(7) was not funded directly. Nonetheless Defendants Jabe and Camache were authorized to use Code § 53.1-44 (Investment of funds belonging to prisoners; use of income) for the costs associated with fulfilling the mandates of Code § 53.1-10(7), for "[a] copy of his birth certificate if such person was born in the Commonwealth." (emphasis added). It has been established that Grethen was not born within Virginia.[2]

3.   Limited resources of the GRCC S2 Law Library, with the services of Mr. David Leary, inmate clerk, have not yielded where Departments of Corrections in states outside of Virginia require a birth certificate, much less over a decade prior to release from prison, as is demanded of the Plaintiff.

4.   Grethen proffers that the requirement that Va. Code § 53.1-10(7) is applied by the VaDOC to be a continual dual revenue stream for the Commonwealth, to-wit:

- The VaDOC incarcerates approximately ten thousand inmates annually, most of which are born in Virginia. If only a quarter of those are without a copy of the birth certificate, requiring direct ordering from the Virginia Department of Vital Records, the minimum income is Thirty Thousand ($30,000.00) Dollars annually.

- Should the inmate have to order the birth certificate from inmate trust account funds, either directly or through loan, the VaDOC receives a $0.99 money order fee.

Hence, this may help to explain the limitation of "[i]f such person was born in the Commonwealth," § 53.1-10(7), which was excluded from VaDOC OP 820.2.[3]

5.   Regrettably, this would not be the only opportunity based income sourced on the incarcerated and their families designed to maximize profitability for VaDOC, as is evidenced by the outrageous fees charged for telephone calls and by Keefe Canteen for electronics and clothing items. These monopolized services both pay the VaDOC a "kickback" for the privilege of their No-Bid contracts.

6.   The mention of Keefe Canteen and the long distance telephone services is only to illustrate that it is totally plausible for the Virginia General Assembly and the VaDOC to have crafted Va. Code § 53.1-10(7) as an economic fundraiser for the Virginia Departments of Corrections, and Vital Records. This is even more credible when considering the failure to fund the mandate of 53.1-10(7). See OP 820.2.[4]

- 17 -

7.  In the briefest of terms, the VaDOC Defendants, through the demanding of the birth certificate from Grethen, have: (i) threatened injury to Grethen's character, person and property; (ii) accused him of a VaDOC 119c disciplinary offense ("DOR"); and (iii) knowingly intent to conceal, remove, confiscate, withhold or threaten to withhold, Grethen's birth certificate (a proported government identification document, by demanding of money (directly or forced loan) or evidence of debt to VaDOC from Grethen. The present loss of 90-Days of Grethen's Earned Sentence Credits for good conduct exemplifies injury by extention of incarceration term, which may move from early-2024 to mid-2026.[5]

8.  Grethen proffers that the above elements meet all of the elements for action of a criminal complaint, pursuant to Virginia Code Section 18.2-59, Extortion of Money, Property or Pecuniary Benefit:

> Any person who (i) threatens injury to the character, person, or property of another person, (ii) accuses him of any offense, (iii) threatens to re-post him as being illegally present in the United States, or (iv) knowingly destroys, conceals, removes, confiscates, withholds or threatens to with-hold, or possesses any actual purported passport or other immigration document, or any other actual or purported government identification document, of another person, and thereby extorts money, property, or pecuniary bene-fit or any note, bond, or other evidence of debt from him or any other per-son, is guilty of a Class 5 felony.

Subsections i, ii, and iii in the above paragraph correspond with i, ii, and iv, respectively, in this paragraph, from which iii does not apply.[6]

9.  The gross injustice of this extortion is reinforced when considering that the VaDOC has never, in more than nine (9) years of Grethen's incarceration, granted to him any job or disability payment due to his medical "D" Code (NO WORK) resulting from birth defects and a permanent disability rating prior to 21-years of age. As such, the moneys required would be extorted from "any other person" that happens to rarely provide outside gifts. See Va. Code § 18.2-59; § 18.2-22 (Conspiracy).[7]

10.  It has previously been stated in the above causes that VaDOC has not given a valid penological interest in gathering Grethen's birth certificate a decade prior to his release. Furthermore, a lesser restrictive means is already in place, with no related expenses to VaDOC prisoners. i.e., Offender Information Form.

11.  A review of the April 5, 2011, hearing tape for 119C DOR, before Defendant S.A. Lawrence, will reveal that Grethen annunciated this defense during hearing. Defendant Lawrence disregarded the defense claim and remaked upon it in closing, before finding Grethen guilty.

12.  Likewise, an examination of the hearing tape with verify that Defendant S.A. Lawrence attempted to "strongarm" Grethen into filling out an application for the unwanted birth certificate before pronouncing judgment.[8]

- 18 -

13. Had Grethen submitted to the strongarm tactics of Defendant Lawrence, at the hearing, to complete a New York birth certificate application, he would have then been responsible for the Thirty ($30.00) Dollar fee. This is admitted by Robinson in the Regional Appeal Response, as "you are required to ... submit[] $30.00 to the Office of Vital Records in New York." Id., p. 2, para. 2.

14. Defendant Robinson is of the opinion that a FORCED loan is not a "taking" act by undue exercise of power. Id., 5, para. 16 ("[O]ffenders who have insufficient funds will be given a loan by the D[OC]"). This does not change the fact that the birth certificate is unwanted by Grethen, who can not possess or use it.

15. When Grethen refused to complete (a yet unprovided New York, New York (five borough only), as opposed to New York State (outside New York City)) application for birth certificate and VaDOC money order withdrawal for fee, Hearings Officer Lawrence found Grethen guilty and sentenced him to loss of 90 Days of his Earned Sentence Credits. This at minimum extends the term of incarceration by a fourteen day period. See Fifth Cause of Action (Retaliation).

16. As a direct and proximate result of the aforesaid conduct of Defendants, the Plaintiff will suffer a continued and unlawful term of extended incarceration and said incarceration will result in Plaintiff suffering future financial injury, in addition to the above referenced FORCED (proposed) loan of Thirty Dollars.

THIRD CAUSE OF ACTIONS FOOTNOTES

[1] Robinson conceded Grethen would be liable for Thirty ($30.00) Dollar fee for New York City birth certificate application or FORCED loan. Regional Appeal, p. 2, para. 2 (fee) and p. 5, para. 16 (loan).

[2] See First Cause of Action, Grethen born in New York and lived in New Jersey.

[3] Unquestionably, if VaDOC Virginia born inmates must purchase birth certificate for in-state births, the revenues go into Commonwealth's Treasury. Robinson is without a defense to this claim. Id., p. 2, para. 32, and p. 6, para. 32.

[4] Ibid. p 2, para. 32, p. 6, para. 32, goes to establish pattern

[5] Immediate loss if 14 days, followed by 54 days annually until in compliance. Robinson proffers that an extended term of incarceration does not cause injury to "[Grethen's] character, person and property." Ibid. p. 6, para. 33.

[6] In addition to Virginia law, violations of New York State and federal laws.

[7] Conspirators: Mfonyam, D. Taylor, S.A. Lawrence, R.H. Williams, G.H. Hinkle, A.D. Robinson, J.M. Jabe and J.R. Camache (at minimum). Ibid. p. 2, para. 34 and p. 7, para. 34 (sidelining fact that VaDOC will not permit Grethen job).

[8] Grethen has not even been provided New York City application and his grievance attemps to acquire proper application have been denied at intake review. See August 17, 2011, New York State Department of Health letter, erferring to the New York City Department of Health and Mental Hygiene, returning application.

- 19 -

FOURTH CAUSE OF ACTION
(Violation of Federal Privacy Act - Birth Certificate)

Plaintiff realleges and incorporates by reference paragraphs

1.   The Plaintiff has a reasonable expectation of maintaining a degree of privacy within the VaDOC, so as to minimize the potential of identity theft. The changes, both federal and state, to court rules for the redaction of social security numbers, home addresses, childrens names, financial information, etc., from court pleadings and decisions support this privacy expection.[1]

2.   Under such rules, documentary evidence which contained personal and financial information was sealed by the Clerk of the Court. This negated arbitrary access to the sealed records and prevented the information from public access.

3.   Grethen had previously illustrated, with the Bignall Affidavit, that VaDOC/GRCC defendants are incapable of <u>securing</u> personal identity documents within "the Institutional Criminal Record," OP 820.2, § VII, A#4, for a matter of months.[2] It seems less likely that the defendants will be able to secure Plaintiff's birth certificate for over a decade.

4.   Grethen already furnished an example of the VaDOC and Prison Health Services (under VaDOC contract) providing his social security number to various types of health services providers, without Grethen's consent.[3]

5.   Obviously, the VaDOC had an alternative to Plaintiff's social security number in the form of his VaDOC identification number. Therefore, there was not a valid penological interest in VaDOC freely distributing the social security number for the ability of Grethen to receive medical care from non-VaDOC personnel, which should include Prison Health Services.[4]

6.   Moreover, the lack of physical possession, by the VaDOC, of Grethen's social security card from the Social Security Administration has never prohibited VaDOC from utilizing his assigned number. Likewise, lack of Grethen's New York (City) birth certificate has not prohibited the VaDOC from using his birth date during the term of his incarceration. Further, certificate needed for "REENTRY."

7.   Henceforth, Defendants Jabe and Camache, when crafting OP 820.2, § VII, had <u>failed</u> to meet the four prong requirements of <u>Turner v. Safley</u>, 482 U.S. 78, 89 - 91 (1987), when requiring collection of birth certificates decades prior to the release from incarceration, given the following:

    1. There is <u>no</u> valid, rational connection between DOP 861.1, § V. CODE of OFFENSES, A. 119c (refusal to obtain birth certificate), and any legitimate penological interest, as the birth certificate was never necessary during any term of Grethen's physical incarceration and has not hindered VaDOC from providing services for him.

- 20 -

2. There are <u>no</u> alternative avenues which remain available for Grethen to protect his identity documents from being confiscated on receipt and absconded thereafter, at the whim of VaDOC employees from some unsecure folder. See Bignall Affidavit. The only protection afforded is non-compliance with OP 820.2, § VII., requirement to provided the copy of the birth certificate and the extended incarceration term.

3. There is <u>no</u> significant ripple effect upon fellow inmates or prison staff in termination of collecting birth certificates decades prior to release from prison, as OP 820.2 mandates are for inmates being released from incarceration. Furthermore, VaDOC minimizes exposure to liability by delaying the process to the "[w]ithin 120 days of release," OP 820.2, § VII, A#3, for a social security card.

4. There is <u>no</u> absence of ready alternatives to collecting the birth certificates, decades prior to release, given that VaDOC Defendants Jabe and Camache have written the alternatives directly into policy:

   i. The stated purpose of OP 820.2 is "[f]or the planning and provision of transitional and reentry services," <u>id</u>., § I., and "[i]n getting proper identity documents upon release." id., § VII., A#1.

   ii. If "[a]pplications may [wait to] be submitted to the Social Security Administration [until being] within 120 days of release," <u>id</u>., A#3, then birth certificate applications must be able to wait until near release also.

   iii. "If the documents [i.e., birth certificate, S.S.N. card] are received after the offender is released , they may be forwarded by certified mail or staff courier within 30 days of receipt to any facility ..." <u>Id</u>., A#4.

   iv. "The Offender Information Form will be accepted by the DMV as a primary proof of residency and as a secondary proof of identity," <u>id</u>., #6 (ii), therefore, <u>no</u> birth certificate even needs to be presented or required.

   v. "The Offender Information Form will also be used by facilities in lieu of the Offender Discharge Form for offenders who are transferred to local jails for Work Release or Pre-Release programs." <u>Id</u>., #6 (iii).

   vi. "Probation and Parole can also provide the Offender Information Form to any former offender, even if they are not currently under supervision." <u>Id</u>., #6 (iv).

8. Subsection 4 (i - vi) of the above paragraph, as word-smithed directly by the Defendants, Jabe and Camache, verifies that there is no need whatsoever for the birth certificate (or even the S.S.N. card) in order to release an inmate. Much less to obtain a Virginia DMV identification card, as Probation and Parole must provide an Offender Information Form at any time, from which ex-felons acquire a S.S.N. card (through Social Security Administration).

9. Defendants Hinkle (failed to respond to any Causes of Action) and A.D. Robinson ("cherry picked") failed to address the <u>Turner v. Safley</u> and ready alternatives, in above paragraphs, issues. See Exhibits D (Hinkle) and E (Robinson) appeal responses.

5

- 21 -

10. Defendant Robinson readily admitted that the VaDOC is unable to acquire the New York City birth certificate, as "[Grethen] may not be directly requesting a copy of [his] birth certificate, only [he is] able to fill in that particular part of the application." Regional Appeal Response, p. 4, para. 13. Thus, Robinson has admitted that Grethen's birth certificate is a private identity document, armored from access of the general public and VaDOC. See Exhibit E.

11. Plaintiff proffers that the defendants (from Jabe downward) have instituted OP 820.2 (REENTRY PLANNING) in violation of the federal Privacy Act, Public Law 93-579, 88 Stat. 1905 (12/31/1974) and Public Law 100-503, 102 Stat. 2507, along with its progeny, when applied to collection of birth certificates (regardless of orgin) from a captive audience, decades prior (if ever) to their release from prison.

12. Analogous to the Privacy Act are a multitude of federal and state (civil and criminal) laws affiliated with protection from "identity theft," the predominant computer / electronic crime since the advent of the World Wide Web, resulting in an entire industry (i.e., Life Lock, etc.) specializing in identity theft protection.

13. Arguably, prisoners are extraordinarily exposed to identity theft, given: 1) long-term incarceration wipes the credit reporting slate clean; 2) their lack of internet access fails to afford "credit alerts" from Life Lock, or like service; 3) most prisoners can not afford identity theft insurance protection; and 4) the prisoners have no ability to protect their identity documents sent to prisons, as these are opened outside of their presence (possibly photocopied) and distributed to whereabouts unknown.

14. What's more, Defendant Robinson failed to deny that the VaDOC has distributed Grethen's social security number ("SSN") to independent contractors (i.e., Prison Health Services) and various dental, hospital and medical entities, without express permission from Grethen. This willfully heightens the potential of identity theft, beyond VaDOC's direct control, every time Grethen's SSN is distributed. Worse, it is possible that Grethen's SSN is published on the VaDOC's VACORIS network (linked through the World Wide Web), for any VaDOC employee to access without supervision or accountability. Did I mention the VaDOC website had been hacked several times?

15. Grethen proffers that the inaccountability in protecting his SSN is material to his concerns of an inability of VaDOC to protect his birth certificate (a decade plus), which the defendants have conceded is not even necessary until release. See First Cause of Action ("Feeble Safeguards" and no valid penological interest).

16. As a direct and proximate result of the aforesaid conduct of Defendants, the Plaintiff is unnecessarily exposed to the potential of identity theft, along with subsequent economic losses, in addition to the suffering of an extended term of

incarceration. Albeit, said extension further exacerbates the probability for use
of protected, through the Privacy Act, identification documentation, as supplied
by the VaDOC (and/or employees, contractors, medical providers, etc.) for purposes
(regardless of accident, negligence, or willful conduct) of identity theft. Hence,
Grethen's privacy interests outweigh VaDOC's frivolous desire to obtain Grethen's
certificate of out-of-state (or in-state, if such had applied) birth, fourteen (14)
years prior to his present scheduled release date in 2024.[6]

## FIFTH CAUSE OF ACTION FOOTNOTES

[1] e.g., Fed. R. Civil Proc., Rule 5.2(a)(Privacy Protection for Filings Made
with the Court (Redacted Filings)); Fed. R. Criminal Proc., Rule 49.1(a)
(Privacy Protection for Filings Made with the Court (Redacted Filings));
and Va. Code § 20-121.03 (Identifying information confidential; separate
addendum).

[2] None of the three (3) of Bignall's birth certificates were returned at time
of release from GRCC, yet all three (3) were returned to him within weeks of
his release. This illustrates inability of VaDOC/GRCC to properly track /
document birth certificates on file, and the needless waste of resources
expended chasing inmates to provide (at inmate expense) multiple copies of
their birth certificates under threat of extended imprisonment. Were VaDOC
required to pay the expense for the birth certificates, maybe accountability
would increase with the added expense requirement to VaDOC.

[3] Robinson acknowledged, "you claim the V[aDOC] has provided your [SSN] to
various types of healthcare providers without your consent," Reg. Appeal
Response, p. 2, no. 36; however, he concluded that "this particular con-
tention is irrelevant to this charge and will not be addressed in this
appeal." Ibid. p. 7, para. 36. See Fifth Cause of Action (Retaliation).

For the record, Grethen did NOT provide or use his SSN for his medical
and/or insurance needs, pre-incarceration. His medical providers had to
create their own internal numbers when Grethen cited Privacy Act of 1974.

[4] Prison Health Services ("PHS") was the on-site health care provider (HMO)
for several VaDOC facilities, from 2002 through mid-2011, at which time
PHS merged and became known as Corizon. Medical Services did not improve,
as staff at GRCC remained the same. The PHS/Corizon contract is set to
expire on October 31, 2011, with medical services to be replaced by the
Armor Medical Corporation.

[5] The original draft of this petition was attached with appeals to Hinkle &
Robinson. Hinkle totally ignored all claims, while Robin answered, de novo,
to limited paragraphs. A copy of original appeals in NOT included. However,
both Hinkle and Robinson appeal responses have been provided, Exhibits D & E.

[6] Were Grethen not to provide a copy of his out-of-state birth certificate,
and VaDOC to reduce his ESC class level from I (4.5 days for 30) to level
IV (0 days for 30), the release date will change from 2024 to 2026. See
calculations in Fifth Cause of Action (756 days for 14-years).

- 23 -



## FIFTH CAUSE OF ACTION
### (RETALIATION FOR ENGAGING IN PROTECTED CONDUCT - BIRTH CERTIFICATE)

Plaintiff realleges and incorporates by reference paragraphs

1.   The Honorable Fourth Circuit Court of Appeals determined "[a] retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct: and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated, at least in part, by the plaintiff's protected conduct," Couch v. Mathena, Civil Action 7:08-cv-00618; 2009 U.S. Dist. LEXIS 7535 (W.D. Va. 2009)(citing Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000), upheld, 339 Fed. Appx. 352 (4th Cir. 2009).

2.   The above four Causes of Action set forth the details required to support a claim of retaliation related to Plaintiff's refusal to provide the VaDOC/GRCC a copy of his New York State birth certificate (which he has never owned), as all three elements within Suarez Corp. Indus. v. McGraw, supra, are satisfied:

 i. Grethen was engaged in protected conduct within the: First Amendment (freedom of speech, converse thereto. i.e., right to remain silent in production of identity documents); Fourth Amendment (secure and free of unwarranted seizure of identity documents), and Fourteenth Amendment, Section 1, of the United States Constitution; Privacy Act of 1974, Public Law 93-579, 88 Stat. 1905 (12/31/1974) and Public Law 100-503, 102 Stat. 2507 (i.e., disclosure limits on identity info.); federal and state criminal laws regarding identity theft (Va. Code § 18.2-186.3, Identity theft; penalty; restitution; victim assistance, and § 18.2-186.4, Use of a person's identity with the intent to coerce, intimidate, or harass; penalty); federal and state laws criminalizing extortion (i.e., Va. Code § 18.2-59, Extortion of money, property or pecuniary benefit); and the federal Civil Rights of Institutionalized Persons Act, Public Law 96-247, 94 Stat. 349 (5/23/1980)(section 4(a)(1)(A)("conditions which deprive rights, privileges ... protected by the Constitution of laws of the United States") and Section 6 (Prohibition of Retaliation).

 ii. Defendants Jabe and Camache designed OP 820.2 (REENTRY PLANNING) and OP 861.1 (INMATE DISCIPLINE, signed by Jabe), for putting in force a punishment, OP 861.1, § V (A)(119c)(refusal to obtain birth certificate), resulting in immediate loss of good time ("Mandatory penalty of 90 Days Loss of Accumulated Good Time") and future loss of good time credits ("reduced to good time Class Level IV until they comply with requirements for Birth Certificates"), See OP 820.2, § VII (A) (2)(d)(i and ii), resulting in an extention of incarceration term. Defendants Jabe and Camache's policies were blessed by Defendant G. M. Hinkle (Memorandum 2008-23 Pertaining Policy: OP 861.1 (6/2/08)), and enacted against Grethen, by Defendants B. Mfonyam, D.L. Taylor, and S.A. Lawrence. Grethen immediately suffered a penalty of "Loss of SGT up to 90 Days - Imposed Value: 90 Days," which was appealed to Defendant L.M. Long and receipted on May 11, 2011. Defendant G. M. Hinkle upheld the conviction on appeal, June 8, 2011.

- 24 -

Obviously, no prisoner wants to intentionally extend imprisonment when the option for earlier release exists. The Bignall Affidavit testifies "[a] person of ordinary firmness" would be deterred from withholding of a birth certificate, by providing THREE (3) copies, should it ensure his speedier release.

Bignall is far from alone in his decision to deter, so as to keep his accumulated good time, by providing his birth certificate. An estimated 50,000 plus inmates (thousands "[not] born in the Commonwealth") of the VaDOC have provided their birth certificate, since the 2003 enactment, rather than lengthen their term of imprisonment through forfeiture of good conduct credits.

iii. "There is a causal connection between elements one and two," Couch, supra, as prior to Grethen's refusal to provide birth certificate, and receipt of the 119c (refusal to obtain birth certificate) DOR, he was receiving the maximum amount of Earned Sentence Credits on his new law sentence. He had earned this rate since 2006. However, on April 6, 2011, Defendant R.H. Williams upheld the removal of 90 days of Grethen's credits. This decision was upheld by defendant G. M. Hinkle, GRCC Chief Warden, on appeal, June 8, 2011. Plaintiff is appealing Hinkle's decision, which failed to address any of the five Causes of Action that were submitted as part of the appeal.

The long term effects could result in Plaintiff's present release date being changed from 2024 until 2026. The loss of 90 days of good conduct / Earned Sentence Credits equals an extension of fourteen (14) days of incarceration. i.e., $4\frac{1}{2}$ days monthly x 3 months = $13\frac{1}{2}$ days; 54 days for 1-year; 540 days for 10-years; 756 days for 14-years, for continued refusal to provide a birth certificate until release.

3. Plaintiff has made evident, Fourth Cause of Action, that there is no valid penological interest in requiring a birth certificate more than a decade prior to his release, as the defendants' own policies state that such is for "REENTRY." It must logically follow that there is no valid penological interest in extention of Plaintiff's term of incarceration, by two years, for failure to provide his birth certificate until shortly before his "REENTRY," see OP 820.2, more than a decade prior to his scheduled reentry date.

4. In conjunction with the retaliation of extended incarceration, the Plaintiff is subjected to transfer to a higher security level institution, with less access to the law library and other programs, upon his next annual review in December of 2011, as his security level points will aggrandize from 15 (Level 2) to 25 points (Level 3). This will prohibit Grethen from being transferred from GRCC to a lower security level institution at the December 2011 annual review.

5. By the same token, the change "Institutional Disciplinary Record," from one (1) to three (3) points for the 119(c) disciplinary charge, and the resulting loss of a "Class Level Assignment … GCA/ESC Level I (L-1 or V-1)[-4]" to "GCA/ESC Level IV [4]" placing Grethen on the highest end of the bubble (17 – 25) of Security Level 3 with a strong likelihood of override to a Security Level 4 (Keen Mountain/SXII) facility.

6. While it is understood that no prisoner has a constitutional right to housing at any particular institution, it is also understood that VDOC is obligated by law to adhere to requirements of the Administrative Process Act, Va. Code § 2.2-4000, which prohibits creation of rules and regulations (i.e., OP 820.2, § VII, A # 2) that exceeds Virginia statutory authority (i.e., Code § 53.1-10(7)("[b]orn in the Commonwealth")), resulting in arbitrary and capricious (in addition to retaliatory) confinement restrictions, at a higher security level facility, with an extension of said term of incarceration.

7. Categorically, the reach of OP 820.2's Birth Certificate requirement, reaching beyond Va. Code § 53.1-10(7), was not made in a vacuum and without knowledge of the legal limitations of "[i]f such person was born in the Commonwealth," id., hence, prison officials (from John M. Jabe,[£] Deputy Director, downward) intentionally acted knowingly, oppressively, and abusively to support due process violations, Daniels v. Williams, 474 U.S. 337, 331-32 (1986), to deprive Grethen of good time.

8. Good time credits are only to be removed for violations of "major misconduct," Wolff v. McDonnell, 418 U.S. 539, 557 (1974), and "serious misconduct," Sandin v. Conner, 515 U.S. 472, 477-78 (1995)(upholding Wolff), neither of which apply to OP 820.2 REENTRY PLANNING, given that VaDOC OP 830.2, SECURITY LEVEL CLASSIFICATION, Attachment # 7 (Disciplinary Report Severity Scale), values a violation of a "119 c. Refusal to participate in testing, classification, or reentry preparation: Refusal to participate in reentry planning or preparation," on the "Moderate - 4 points," of a scale that includes terms of "Highest - 20 points" and "High - 10 points" for expressions of "major" or "serious" misconduct, as defined by Wolff and Sandin. It is no small matter that this applies regardless of in-state or out-of-state birth.

9. The unprincipled and retaliatory conduct of the Defendants, from creation unto enforcement of OP 820.2 (birth certificate requirement) and OP 861.1 (DOR 119(c)), as described above, is without adequate penological justification, Turner v. Safley, 482 U.S. 78 (1987), violates Grethen's "speedier release," Preiser v. Rodriquez, 411 U.S. 475, 500 (1973), and other constitutional rights cited herein.

10. As a direct and proximate result of the aforementioned conduct of Defendants, but for relief from this Honorable Court, Plaintiff will suffer an extended term of incarceration (14 days - 2 years) resulting in future financial injury, given that the loss of Grethen's Earned Sentence Credits is NOT based on speculative award of future earnings, but the removal from established (5-years) highest earnings level I (4.5 ESC days monthly), to the lowest (0 ESC days monthly) level IV.

11. The measure of punishment, extended incarceration, far outweighs any admitted "REENTRY" value of requiring a birth certificate a decade prior to "REENTRY." This

[£] John Jabe has been replaced by N. H. Scott as Deputy Director.

hyperbolic response to a benign "REENTRY PLANNING," OP 820.2,[4] requirement affirms that the prison officials (from Jabe downward) acted knowingly, oppressively, and abusively, Daniels v. Williams, 474 U.S. 327, 331-32 (1986), to design and enforce policies and procedures (OP 820.2 and 861.1) to intimidate and coerce Grethen to provided a birth certificate that the VaDOC could not lawfully obtain without the private information (protected by federal and state laws) provided by Grethen. See First Cause of Action (Due Process Violation), pages 6 - 16.

## FIFTH CAUSE OF ACTION FOOTNOTES

[1] Robinson acknowledged, "in your fifth cause of action, you state three [3] elements within a particular court case," Regional Appeal Response, p. 2, no. 37; however, he concluded that "this particular contention is irrelevant to this charge and will not be addressed in this appeal." Ibid. p. 7, para. 37. The identical response was given for paragraph 36, related to "you claim the V[aDOC] has provided your social security number to various types of healthcare providers without your consent," ibid., p. 2, no. 36. See Fourth Cause of Action (Violation of Federal Privacy Act)

[2] Annual Reviews are governed by OP 830.1 (Facility Classification Management) with OP 830.2 (Security Level Classification), which incorporates Good Time Awards, OP 830.3, into DOC-11B form (Security Level Reclassification). The shift from Class Level I (100 to 85 points) to Class Level IV (44 to 0 points) will add eight (8) points to Grethen's Security Level. See attached DOC-11B, Date: 12/13/2010, for period 12/2/2009 - 12/2/2010.

[3] Quotation from DOC-11B, effective date of 12/2/2010, for points range. Award at 2010 Annual Review was Level I, due to "Class Level Score: 67, Override: 5 - Lack of program availability, Class Level: Level 1." The override is used on a regular basis, given Grethen is classified "D Medical" (disability) and is not permitted any employment within VaDOC (10 years now), despite a management degree from Virginia Wesleyan College (B.A., 3.645 G.P.A., magna cum laude), and having owned two (2) successful corporations. Grethen's college education was funded by the Virginia Department of Rehabilitative Services and Veterans Administration, given his "permanently incapacitated prior to age twenty-one" status from the Department of the Navy, Naval Military Personnel Command, in 1981. See Exhibits J (Va. Wesleyan transcript) and K (Dept. of Navy letter).

[4] Not only is it a "hyperbolic response," it is economic foolishness to expend upwards to Sixty ($60,000) Thousand Dollars (at 2011 money, not to mention a higher rate from 2024 - 2026, when Grethen is 65 - 67 years) for an extension of two (2) years incarceration for failing to provide a "REENTRY" document.

[*] Grethen's "[r]ight of freedom of thought protected by the First Amendment against State action includes both the right to speak freely and the right to refrain from speaking at all. ... The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind. ... Compelling the affirmative act ... invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." Wooley v. Maynard, 430 U. S. 705, 714-715 (1977)(internal citations and quotations omitted). See also, Kolender v. Lawson, 461 U.S. 352, 355-357 (1983)(overbroad & individual freedom)

## SIXTH CAUSE OF ACTION
### (Continuing Violation of State Created Liberty Interest)

Plaintiff realleges and incorporates by reference paragraphs 1 - 123.

1. Plaintiff has previously established that he has a "State Created Statutory Liberty Interest in Earned Sentence Credits," First Cause of Action, within Code of Virginia sections 53.1-202.2 and 53.1-202.3.

2. The statutory language of 53.1-202.2 clearly states that "[e]very person who [] is sentenced to serve a term of incarceration in a state or local correctional facility shall be eligible to earn sentence credits ... [which] shall commence upon the person's incarceration in any correctional facility ...," which would include local jails (Western Tidewater Regional Jail, Portsmouth City Jail and Chesapeake Correctional Center) where Plaintiff was housed in 2000 (bond), 2001 - 2002 (conviction).

3. "A maximum of four and one-half sentence credits may be earned for each thirty days served," Va. Code § 53.1-202.3, resulting in a firmly implanted State created liberty interest in a (possible) maximum incarceration term of eighty-five percent, were the maximum credit awarded from moment of conviction. i.e., were it NOT, then no prisoner could remotely earn the full measure of the statute.

4. The Earned Sentence Credit ("ESC") awards are presently regulated within DOC OP 830.3 (GOOD TIME AWARDS), subsection VIII:

   B. There are four Class Levels in the ESC system differentiated by the amount of ESC earned per 30 day period served. The entire ESC reduces the time the offender must serve to satisfy the sentence.
   • Class Level I - the offender earns 4.5 days ESC for every 30 days served
   • Class Level II - the offender earns 3 days ESC for every 30 days served
   • Class Level III - the offender earns 1.5 days ESC for every 30 days served
   • Class Level IV - the offender earns 0 days ESC for every 30 days served

The VaDOC rules and regulations in place in 2002, when Plaintiff was received into the VaDOC (at Deep Meadows Correctional Center), provided for the same credits.

5. Nonetheless, the Plaintiff was not awarded Class Level I (4.5 days monthly) by the VaDOC from the date of his conviction forward, as there was the practice of an award of Class Level II (3 days monthly), from the gate, for all VaDOC prisoners, at the time of Plaintiff's receiving (DMCC) and transfer to Powhatan Correctional. Said policy (written or unwritten), custom (arbitrary and capricious), and practice (official or unofficial), resulted in an extension (deliberate by design) of eighteen (18) days (1.5 x 12 = 18) towards Grethen's term of incarceration. This ONLY is an accounting for the first year of incarceration. Documents withheld by Hinkle.

6. What's more, this practice continued at the Powhatan Correctional Center until Grethen was transferred in January of 2005, after an Annual Review in December 2004, in which Counselor Clairborne removed Grethen's thirty (30) points for completed GED and resulting Class Level IV assignment, despite a college degree (B.A.). Exhibit J.

7.     Grethen was, and continues to be, "[a] Qualified Individual with Disability," as defined within the Americans with Disabilities Act ("ADA") of 1990, Public Law 101-336, 104 Stat. 327, and the Rehabilitation Act ("RA") of 1973, Public Law 93-122, for which the Virginia Department of Rehabilitative Services and the Veterans Administration, due to a permanent disability rating "prior to age twenty-one," had funded tutition, books, and fees for a four year bachelor's degree, from Virginia Wesleyan College (1984 - 1988). See Exhibit K (Dept. of Navy, disability letter).

8.     The Virginia Department of Correctional Education ("VaDCE") and VaDOC possess official transcripts (originals) provided directly from Barbara S. Adams, Registar, of Virginia Wesleyan College. Nonetheless, due to the computer program (pre-VACORIS, which only included High School Diploma or GED) the VaDOC inconsistently applied an education completion (credits) to previous Class Level Evaluations, prior to 2006, at which time he was *finally* awarded Class Level I (4.5 days monthly). Exhibit J.

9.     The VaDOC has *always* recognized Grethen's "Qualified Individual with Disability" ("QID") status, and assigned Grethen a "D Medical" status and "NO WORK" at initial, Deep Meadows, intake physical. While this affords seventeen (17) out of twenty (20) points towards the "Work" category of the Good Time Awards, OP 830.3, it is *NOT* a blessing, but a curse, as Grethen has *never* been permitted any vocational program or work. Nor, because of his college degree, has he been permitted an educational program. The lack of program completion adversely affects his Annual Review, as the Good Time Award of ESC rolls over to the Security Level Reclassification.

10.    When Counselor Clairborne removed Grethen's education points, in December 2004, it was at a time when the resulting change (an additional six (6) security points) raised Grethen's Security Level from Level 3 to Level 4. Thus, he was transferred from Powhatan to Sussex II State Prison in January 2005, prior to completing the grievance concerning the loss of the educational points, resulting in the reduced ESC award, and elevated Security Level points. Documents withheld by Hinkle.

11.    When Grethen was housed at Sussex II State Prison ("SXIISP"), he was placed in the same non-smoking pod as inmate James Patton Anderson, III, who was on Grethen's Enemy List. Anderson, who is currently incarcerated for sodomizing a 10-year old boy (after his release from VaDOC for murder of a taxi driver), had done likewise to Grethen and his older brother between 1967 - 1973. Additionally, Anderson raped Grethen's younger sister, while Grethen was vacationing in Oklahoma in 1973. Finally, not only had Anderson used Grethen to molest his friends, he prostituted Grethen.[1]

12.    Grethen, after filing two (2) emergency grievances at SXIISP prior to his face-to-face encounter with Anderson, was only in general population for a couple days before his isolation and subsequent transfer to Keen Mountain Correctional Center.[2] Documents withheld by Hinkle.

- 29 -

13.   It would not be until December of 2006 that Grethen would be removed from an ESC Level IV (0 days monthly) to a Level I (4.5 days monthly) award, which he has maintained at Red Onion State Prison, Keen Mountain Correctional (7/07 - 12/08) and Sussex II (12/08 - 5/10), prior to his transfer to Greensville, where he maintained his Level I ESC during his Annual Review in December 2010. [3]

14.   In short, the VaDOC record testifies that Grethen was, both pre and post the removal of the thirty (30) educational points, capable of maintaining either Levels I (post) and II (pre) Earned Sentence Credit awards. Therefore, Grethen proffers, had not Counselor Clairborne removed said education points, Grethen would not have ever been assigned (or remotely considered for) ESC Level IV (0 credits).

15.   Obviously, a recalculation of Grethen's ESC from the point of conviction would result in a "speedier release," Preiser v. Rodriquez, 411 U.S. 475, 487 (1973), of him from prison, by means of habeas corpus relief. [4] Eighth Amendment violation.

## Legal Arguments Concerning Ex Parte Young[*]

16.   The above facts present "[t]he allegation of an ongoing violation of federal law [and] claim that [VaDOC] has failed, and continues to fail," Antrican v. Odom, 290 F.3d 178, 186-187 (4th Cir. 2002)(citing Ex Parte Young, 209 U.S. 123 (1908)), to properly credit Grethen for his State Created Liberty Interest in VaDOC Earned Sentence Credits (beginning at Level I from conviction), and restoration for award taken for higher education discrimination. [5] See Exhibit J (Wesleyan transcript).

17.   A recalculation of Grethen's ESC could result in a total reduction of his term of incarceration by approximately eight (8) months to ten (10) months, as removal of educational points triggered subsequent events at SXIISP, KMCC and move to ROSP. [6]

18.   Arguably, the injury to Grethen has yet to occur, as he will not actually have to serve the additional term until the last of his sentence, presently scheduled in 2024. However, this is subject to change based on the above Causes of Action over a VaDOC OP 820.2 and OP 861.1 (119(c)) birth certificate matter.

19.   The Commonwealth previously conceded that this type of habeas claim is ongoing and actionable at the end of prison term, to-wit:

"Presently permitting these type of habeas actions also serves to reduce the prospect of a prisoner serving too many days in confinement [since] the prisoner must wait to litigate until the effect of an order entered in his favor will result in his immediate release [which] he will by then have served too much time [after] prisoner has already been confined too long."

Carroll v. Johnson, 278 Va. 683, 685 S.E.2d 647 (2009)(Commonwealth's Appellate Brief for Respondent, Mark R. Davis, Sr. Ass't A.G.)(emphasis added).

20.   Recalculation of Grethen's ESC would moot the issue for future post-release litigation and economic damages, related to this and five (5) other claims herein. See Exhibit I (Haymes' ESC restored).

- 30 -



21.  The Honorable Circuit Court of Greensville County, W. Allan Sharrett, Chief Judge, presiding, recently considered a homogeneous ESC miscalculation matter by VaDOC, Haymes v. Johnson, Case No. CL10-287, "concerning the restoration of 15 days of earned sentence credits ... [removed] on July 7, 2008, [when] he was improperly assigned from E[SC] class level I to ESC class level II, ... [had] determine[d] that the Petition should be dismissed as moot because Haymes received the relief he requested." Id., ORDER, p. 1, para. 2. Likewise, the VaDOC could moot this instant claim by recalculating Grethen's ESC awards since conviction, sua sponte. [7] Exh. I.

22.  Mr. J. Michael Parsons, Assistant Attorney General, Correctional Litigation Section, Public Safety & Enforcement Division, a prudent man capable of foresight, represented the Commonwealth in Haymes, supra, and determined that "upon entry in the VDOC, Haymes was assigned to ESC class level I, earning 4.5 days of ESC for every 30 days served." Id., Motion to Dismiss as Moot, p. 2, para. 4, Exhibit I.

23.  Grethen has alleged that at the time of his entry into VaDOC, December 2001, he was assigned ESC class level II. Whereas, a subsequent policy change resulted in Haymes, in 2006, being "assigned to ESC class level I," id., upon entry. Therefore, Grethen has been denied the same equal protection in a State Liberty Interest, Va. Code §§ 53.1-202.2 and 53.1-202.3, that was afforded Haymes, VaDOC No. 1194620.

24.  Grethen proffers that Josette Coleman, "a Supervisor for the Court and Legal Services Section for the V[aDOC]," Coleman Affidavit, p. 1, para. 1, in Haymes, is capable of both verifying that "upon entry into the VDOC, Haymes was assigned to class level I, earning 4.5 days of ESC for every 30 days served," id., para 7, and Grethen was not assigned the highest level. (14th Amendment Equal Protection Cl.)

25.  By the same token, Coleman can deduce the origin of Grethen's reassignment of ESC class level II to class level IV, in December 2004, to be rooted in removal of previously granted education points (30) for having a college degree from Virginia Wesleyan College, May 14, 1988. Obviously, VWC verified Grethen's prior education.[8]

26.  It is contrary to the rules of logic that the VaDOC, which itself provides a limited selection of college courses within its facilities, would not have had any provisions for tracking college achievements, prior to the recently enabled VACORIS software, which violates Higher Education Act, Public Law 89-329, Title IV, Part B.

27.  When considering all factors related to the December 2004 Annual Review, the removal of the educational points pushed the heightened security level points and resulted in Grethen's "diesel therapy" transfer to Keen Mountain, from Powhatan, and retaliation (the additional lost good time), resulting in transfer to Red Onion.[9] All the same, had not the educational points been removed, no additional lost good time would have occurred at Keen Mountain, or the egregious Anderson incident.[10] Documents withheld by Hinkle.

28. More than mere negligence has been inferred within this claim; therefore, it is put forward that the VaDOC should become less rigid and award the full measure of Earned Sentence Credit Class Level I (4.5 days for every 30 days) to Grethen, from the point of conviction forward to present date, including the restoration of fifty-four days for removal of ESC related to disciplinary offenses at the Keen Mountain Correctional Center, in 2005, where Grethen was not afforded a qualified psychiatric consult with a medical doctor (psychiatrist) or administration of any psychotropic medication for the posttraumatic stress suffered from VaDOC creating the face-to-face encounter with James Patton Anderson, III, at SXIISP.

## SIXTH CAUSE OF ACTION FOOTNOTES

1 Anderson was Grethen family's baby-sitter, post-divorce, both families had attended the same church and lived within walking distance of the other. Grethen listed Anderson as the first person on his Enemy List, at intake, on the very first day while at Deep Meadows, three years prior (1/28/02).

2 Grethen had alerted Powhatan treatment and counseling staff that Anderson was housed at SXIISP and was on Grethen's enemy list, they assured Grethen he was not going to SXIISP, but directly to KMCC. Grethen immediately had telephoned his father to check VaDOC website for Anderson's location, to see if he had been transferred. He had not. Therefore, Grethen had verbally inquired about Anderson, followed by two (2) emergency grievances (and phone calls to Grethen's father), prior to the face-to-face event. Grethen, who had not seen Anderson since 1973, identified him by the VaDOC id card that was clipped (stupid SXIISP policy) to his state shirt.

3 The ROSP experience was due in part to the Anderson experience, followed by Grethen filing two (2) complaints against KMCC staff for groping him in the groin during "patdowns" when exiting the chow hall. This was also compounded by a vitamin B12 deficiency (neurological disorders), that was not remedied (with 10 vitamin B12 injections in 10 days by Dr. Moshe E. Quinones, M.D.) until after Grethen received four (4) institutional charges in one day.

4 The six claims presented herein will exhaust the AEDPA requirement to State petition, prior to filing a federal habeas petition. The Commonwealth is aware of Grethen's litigation skills. Preiser was denied sentence credits.

5 Grethen should not be penalized for having achieved a college degree, just because Powhatan staff was upset that Grethen would not retake his G.E.D., which he originally received in Tulsa, Oklahoma, in 1974. Copies of the VWC transcript will be forwarded to this Honorable Court from the Registrar.

6 The additional two months (appx.) includes restoration of lost ESC at KMCC, for which Grethen previously filed legal action. The resulting retaliation for that filing was ten (10) additional disciplinary infractions within the following six (6) months, of which all but two (2) were overturned. Warden Mathena, recognizing the endless retaliation, transferred Grethen to SXIISP in December of 2008. Grethen had maintained his ESC class level I award.

* See Shomo v. City of New York, 579 F.3d 176, 182 (2nd Cir. 2009)("[T]he continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim ...")

7
Court and Legal Services Section for VaDOC maintains jurisdiction to adjust the sentencing structure at anytime during physical custody. Court and Legal routinely reviews (and adjusts where required) ALL inmate sentences within a six (6) month period of scheduled release. Hence, Court and Legal (presently, as in Haynes) has authority to correct the error of issuing ESC class level II (3 days per 30), rather than class level I (4.5 days per 30), from point of conviction. Likewise, Court and Legal can correct the error of removing Grethen's educational points in December 2004 and fallout thereafter.

8
Mrs. Barbara S. Adams, VWC Registrar, will be forwarding original copies of Grethen's transcripts to this Honorable Court, A.D. Robinson, J. Coleman, and the Office of the Attorney General, as evidence in this matter. Exh. J.

9
Within three (3) months of Grethen's transfer to KMCC, as a result of filing sexual assault complaints against two (2) KMCC correctional officers during "patdowns," he received four disciplinary infractions in one day. This had resulted in both isolation and lost good time for the two 100 series charges. Obviously, this was a form of double punishment. Many of the same KMCC staff involved in these original charges (April 2005) were subsequently involved in the retaliation charges (post-ROSP return in July 2007), after Grethen filed suit in the original charges, once witness affidavits had been secured. NONE of this would have occurred, but for removal of educational points at PCC.

10
Grethen sought, and was denied psychiatric consult and medications while at KMCC. However, Mr. Baker, psychologist, refused to refer Grethen to services of the psychiatrist. At no time in two (2) years, either before or after the Red Onion experience, was Grethen ever permitted a psychiatric visit by Mr. Baker. Yet Grethen has been given psychotropic medication (which also assist with Grethen's seizure (involuntary myoclonic movements) activities) at every other VaDOC facility, but for KMCC, under direction of Mr. Jarrad Baker, who stopped Grethen's active prescriptions (and hundreds of other KMCC inmates) for psychotropic medications. Grethen's April 2005 OP 861 disciplinary charge (129. Gathering around or approaching any person in a threatening or intimi-dating manner) was the result of an involuntary myoclonic movement towards a correctional officer, after a physical "patdown," and crouch groping, by Mr. D. Cooper, Correctional Officer, upon exiting the KMCC Chow Hall.

Grethen had been attempting to persuade KMCC Dr. Moshe E. Quinones, M.D., to provide 10 vitamin B12 injections (1000 i.u. each) in 10 days PRIOR TO the unfortunate events of April 14, 2005, so as to reduce Grethen's petit seizure activity and lessen the effects of his pernicious anemia, elevated Anti-Nuclear Antibodies, and peripheral neuropathy. The injections were not begun until AFTER the four (4) disciplinary charges and isolation on April 14th, triggered by involuntary movements as a result of inflammed nerves from birth defects, including spina bifida at L5/S1, for which Grethen has had only one (1) neurological consult (Dr. John DeLorenzo, M.D., Oct. 2002) without the six (6) month follow-up or MRI of Grethen's head, as ordered. Dr. DeLorenzo ordered, and Dr. Mark Ammonette, M.D. (Powhatan, now the 2nd highest VaDOC doctor at Richmond) provided, Vitamin B12 injections at every other week, as Grethen's ANA Full Panel Profile was 1:640 (speckled - HIGH). On Grethen's return to KMCC, Dr. Quinones again gave 10 B12 injections in 10 days, and continued the bi-weekly injections (until Quinones indicted in January 2008 for selling guns to a felon). Since, VaDOC has withheld the B12 injections (9 months) and cancelled them at least twice. Grethen has since attempted stabbing his liver twice to receive outside medical help, when B12 injections cancelled.

## SEVENTH CAUSE OF ACTION
### (Failure to Serve Kosher-for-Passover Meals - Food)

07/12/11   **GCC-11-REG-00544 FOUNDED; Failed to respond at Level III (Richmond)**

06/27/11   **Level II FOUNDED, but failed to fix the problem:**
"No additional remedy is deemed warranted at this time. If new alleged problems arise, you may report them directly to supervision and/or file an informal complaint form."

06/08/11   **Level I FOUNDED, but failed to fix the problem:**
"Chaplain Beighley advised that the Common Fare diet does not meet requirements of Kosher-for-Passover meals and you did not receive the appropriate meals during this period. Corrective action has been taken with staff involved on 05/18/11, for food service staff to take into consideration religious needs during this time period."

**Parties:** Harold W. Clarke, VaDOC Director; Mark E. Engelke, DOC Dir. of Food Srv.; Ron Abernathy, former GRCC Food Srv. Mngr.; Dana Y. Kinsley, Grievance Office, GRCC; UNKNOWN GRCC Warden / Ass't Warden (can't read signature); Kay Whitehead, former ERO Ombudsman; A. David Robinson, former ERO Dir. Canteen Correctional Services, former GRCC Food Services Contractor. NOTE: The VaDOC may have to exercise substitution of parties for claim.

**Complaint Alleged** "At no time during the Feast of Passover 2011 did Canteen Correctional Services serve a Kosher-for-Passover meal to me, as EVERY tray contained one of more of the following:
"wheat; rye; barley; oats; spelt; corn; legumes (soy, peanuts, etc); rice; mustard; ~~alcohol~~; ~~beer~~; dextrose (from wheat of corn); sorbitol' ALL of these foods are prohibited for possession and consumption during Passover."(**Source:** Aleph Inst. Calendar, Abridged Guide; Passover)

**Response** "Speak w/ the chaplain," Mr. R. W. Abernathy, May 5, 2011.

### Facts Related to Seventh Cause of Action

1.   This is an annual problem in the Virginia Department of Corrections ("VaDOC"), having occurred to Grethen both prior and since 2011, as Food Services Manual, Chp. 4, § VII. PASSOVER, E., only requires that "[o]ffenders celebrating Passover can eat from the regular serving line with the **exception of matzo substituting for bread**," (emphasis added)(1/1/2010).

2.   While plaintiff had exhausted this matter while at the Sussex II State Prison during Passover of 2009, GRCC staff deprived him of the exhausted SXII grievances for nearly three (3) years after his May 2010 arrival at GRCC. Grethen experienced a retaliatory transfer from SXII for a complaint filed with the United State Dept. of Justice, Civil Rights Division, regarding Americans with Disabilities Act discrimination, on May 7, 2010. His grievances were limited the day before exiting SXIISP, on May 6th, and GRCC enforced the ninety (90) day limitation. The 2009 grievances, albeit UNFOUNDED, were timebarred by receipt in 2013 at GRCC.

3.   The above referenced 2011 grievance is the FIRST **FOUNDED** grievance related to Kosher-for-Passover meals, which the VaDOC intentionally, deliberately, willingly,

maliciously, and wantonly deprives Grethen of annually, during Passover, for which he historically lost nine (9) to ten (10) pounds over the twenty-eight (28) meals (a 9 day period, 26 reg. & 2 Seder meals). In 2013, Grethen lost fifteen (15) pounds. See below.

4.   The quoted list of prohibited foods is located in "PASSOVER FOODS" section of the annual Aleph Institute calendar, which along with the **National Liberator** (also contains a "Passover Heads-Up"), are made available for FREE to the VaDOC staff and policy makers. The requirements for Kosher-for-Passover foods is _extremely_ higher than that of even kosher food, which is **NOT** the same as VaDOC's Common Fare meals.

5.   The above cited "regular serving line" mention in FSM, Chpt. 4, does not even address Grethen's Common Fare Meal participation, since 2004. Normally, accepting a tray from the "regular serving line," if a Common Fare participant, will result in an Institutional Hearing Authority ("IHA") determination for "Removal from Common Fare," FSM, CHpt. 4, § V. (N)(2). See also OP841.3 **Offender Religious Programs** and B.A. Wright's 2012-21 OP 841.3, June 5, 2012, Memorandum ("[OP 841.3] is changed to include provisions for ... removal from the Common fare diet."). NO religious standard exists to participate in the "regular serving line," yet it is the only mention in VaDOC policy and procedure addressing meals to be served during Passover and Days of Unleavened Bread.

6.   "ALL foods purchased for this [C/F] program, except fresh fruits and vegetables, will be certified by a recognized Orthodox Standard, such as "U", "K", or "CRC."." FSM, Chpt. 4, § V.(D). Yet no such standard applies to "regular serving line." If a Rabbinical authority must be applied to the daily Common Fare menu, must not higher standards be applied when the Rabbinical authority requires Kosher-for-Passover? A "kosher" meal is **not** Kosher-for-Passover, as the process requires supervision from a Rabbinical authority from the field to harvest; harvest to storage; while stored; storage removal and transportation; production of Kosher-for-Passover certification; and finally, warehousing and final transportation.

7.   The strict scrutiny is due to the detection of water/moisture (as minute as a pack-animals sweat) at any stage that could cause fermentation, thus disqualifying - what would normally be considered kosher - from receiving a Kosher-for-Passover certification. See e.g., **Kitzur Shulchon Oruch** (a/k/a "The Code of Jewish Law"), by Rabbi Shlomo Ganzfried, Chpt. 108: **The Wheat and the Flour for Matzos**; Chpt. 109: **The Water Used for Matzoh**; and Chpt. 110: **Kneading and Baking the Matzos**. A higher "matzo" standard applies to all Kosher-for-Passover products, as "[a]ccording to several great halachic authorities, the grain must be watched over from the time it was harvested onward," _id._, Chpt. 108 (1). Hence, why there is a prohibited grains list requirement for observant Jews.

- 35 -

8.    The prohibited grains list is **not** simply limited to consumption of non-Kosher-for Passover foods, but also their possession, as prohibited grains are "chometz." See **Kitzur**, Chpt. 111: **The Search for and the Nullification of Chometz**; Chpt. 112: **Products Containing Chometz That May Not Be Kept on Pesach ...**; and Chpt. 114; **The Sale of Chometz**. Thus, there is no picking around a non-Kosher-for-Passover Common Fare tray to find something to eat, as "[e]very moment that a Jew possesses chometz ... he transgresses the Torah's commendments which forbid chometz to be seen or [to be] found," **id.**, Chpt. 114 (1), in his possession.

9.    Common Fare does not even meet the Kosher standard, at GRCC, as the C/F meals are **not** prepared in a Kosher kitchen. Recently, on January 25, 2013, Mr. A. David Robinson, (now) Chief of Corrections Operations, admitted in his Memo # 013-2013, **Faith Review Committee Docket**, p 2 item # 11, that "only one institution has the Kosher diet," which requires a Kosher kitchen. It is the Buckingham Correctional Center ("BKCC"), and Grethen's 2011 attempts to acquire applications (I/C #s GCC-11-INF-05638 (Counselor B. Mfonyon) and 05639 (Chaplain Beighley)) for the Kosher diet at BKCC failed. Both attempts to grieve the complaints failed intake at GRCC, and intake review at the Eastern Regional Office ("ERO") levels, being determined by Ms. K. Whitehead (then Regional Ombudsman), on August 2 and 22, 2011.

10.    As part of Chaplain Beighley's 2011 Kosher research, on Grethen's behalf, he had determined that BKCC was **not** accepting any applications for expanding Kosher diet. Further, he relayed that BKCC did not serve the Common Fare diet. Therefore, if Grethen wanted to transfer to BKCC, he wouls first have to voluntarily remove himself from the C/F diet and would not be permitted the Kosher diet, which appears to be limited to the previous successful litigants only. Neither Chaplain Beighley or Mr. B.A. Wright (former Lead Warden) would commit these matters to writing.

11.    Having established that: 1) neither Common Fare or "regular serving line" can meet the Kosher standard; 2) GRCC does not have a Kosher kitchen; 3) the Fosher-for-Passover certification far exceeds everyday Kosher standards; 4) VaDOC is not expanding the Kosher program at BKCC; and 5) Kosher-for-Passover certification can only come from a recognized Rabbinical authority, Grethen proffers that the only means available for VaDOC / GRCC to have provided him with any meals he could have possessed and eaten,  would have been in prepackaged "heat and eat" Kosher-for-Passover Rabbinical certified meals cooked in a **new** microwave specifically used only for Kosher-for-Passover meal preparations.

12.    As is Grethen's habit during Passover, he requested the Kosher-for-Passover meal at the special diets passage (prior to the serving tray slot) at each meal he attended, April 18 - 26, 2011. The GRCC food services (Canteen Correctional Services, since replaced) staff repeatedly placed the failure to provide Kosher-for-Passover

meals on their manager, Mr. Ron Abernathy, who failed to make himself available to Grethen at anytime during Passover 2011 or 2012.

13. When no Kosher-for-Passover foods were provided, Grethen refused to accept a meal. This practice continued until the twenty-six (26) meals of Passover / Days of Unleavened Bread (severed in the chometz contaminated Chow Halls) expired, leaving the 53-year-old Grethen extremely malnourished. The two (2) additional held meals, were due to Ron Abernathy's refusal to provide the **Shulchan Orech** (festive meals) for the Seder Plate celebration and reading of the **Passover Haggadah** (retelling of Exodus from Egypt), on April 18 and 19, 2011.

14. The above cited response of Ron Abernathy, on opening complaint, testifies of his attempt to deflect his responsibilities to Chaplain Beighley, who affirmed to Ms. Dana Y. Kinsley, that there was a prohibited foods list and Kosher-for-Passover certification standard.

15. That the VaDOC is aware of and abides by very similar prohibites foods lists is evidenced by **FSM, Chpt. 4, § VI. Ramadan and NOI Month of Fasting** (G)(6):

    6. Menu Notes (Nation of Islam Month of Fasting) - Substitutions - If a menu substitution must be made, refer to this list of **UNACCEPTABLE** foods:

        a. Pork, beef, poultry

        b. Dried Beans, (except Navy) and peas

        c. White and corn bread

        d. Soybean flour or oil

        e. Kale, turnip, collard, or mustard greens

        f. Sweet or white potatoes

        g. Peanuts, coconut, or other nuts

        h. Cheese, made with any pork products

        i. Refined sugar products

        j. Grapejuice

16. Given that VaDOC complies with the 30-day NOI prohibition for thousands of the Ramadan participants, statewide, annually, it can not be said that there is equal protection provided for a handful of Jewish inmates for nine (9) days of Passover. Nor can it be said to be an economic hardship on VaDOC to provide the Kosher-for-Passover meals at VaDOC expense, as opposed to the present practice of placing the financial burden on the Jewish inmate. See below.

17. By the same token, availability of the NOI Month of Fasting **UNACCEPTABLE** foods list to Ms. Dana Y. Kinsley (also Law Library Supervisor) had provided a comparable authority via which said Kosher-for-Passover prohibited foods list could have been incorporated into the GCC-11-REG-00544 **FOUNDED** grievance response. However, she did not provide a solution, and the warden (illegible signature) approved as written.

18.  Nonetheless, Ms. Kinsley's response contained the courtesy copy supervisory notification to D. Zook (former GRCC warden); M. Engelke (VaDOC Director of Food Services, statewide); and R. Abernathy (former GRCC Food Services manager), so as to provide them with the ability to make appropriate changes for subsequent years. However, none would be made, and Grethen's weight loss in 2012 was 9½ pounds, then in 2013, 15 pounds, during Passover, despite the June 8, 2011, Level I notice.

19.  While not required to appeal a FOUNDED grievance (i.e., satisfactory district court decisions are not appealed to a circuit court by the victor) to the regional level (where it may be overturned, becoming UNFOUNDED), Grethen did so anyway. In part, his argument cited then VaDOC OP 841.3, Attachment #7 (Master Religions Cal), which "fully acknowledges and authorizes that 'Kosher-for-Passover food items and meals' are required for 'my sincerely held religious beliefs.' However, the purchase BURDEN is placed upon me to acquire the 'food and meals from the Aleph Institute' at my expense." An impossible feat due to Grethen's perpetually induced DOC indigence status, related to the Americans with Disabilities Act violation. See below.

20.  On June 27, 2011, Mr. A. David Robinson, then Regional Director, signed Level II GCC-11-REG-00544, prepared by Ms. Kay Whitehead. However, he did not grant the required permission to advance to Level III, in accordance with OP 866.1 **Offender Grievance Procedure**, § VI, #3 (Level III, Deputy Director or Director). The Level II response assured that **no** correction was intended to be made:

> "No additional remedy is deemed warranted at this time. If new alleged problems arise, you may report them directly to supervion and/or file an informal complaint form."

Given that an informal complaint is afforded "15 calendar days," OP 866.1, § V. (A)(2) and (B), there was **no intention** of resolving the issue in 2012 either, as by the time the complaint was answered, Passover would be over.

21.  Upon receipt, on July 6, 2011, Grethen sent the Level II grievance response to Mr. Harold W. Clarke, VaDOC Director, for Level III review, despite the lack of permission, in accordance with OP 866.1, § VI., #3 (d):

> Grievances appealed to the Deputy Director or Director's Office will be reviewed to determin if they qualify for a response by this level. Grievances, which do not qualify, will be returned to the offender indicating such. Grievances, which qualify for a Level III decision, will be responded to by either the Deputy Director or the Director, as appropriate. The offender will be advised that this is the last level of appeal and that he/she has exhausted all administrative remedies.

Inasmuch as the level II response had not granted permission to proceed to a Level III review, it concluded, "Level II is the last level of appeal for this grievance. You have exhausted all administrative remedies." GCC-11-REG-00544, June 27, 2011.

22. The Level III review of GCC-11-REG-00544 was BULK mailed with GCC-11-REG-00572 on July 6, 2011, and both are date-stamped "RECEIVED JUL 12 2011 OMBUDSMAN SERVICES UNIT" for religious issues review. Both were returned in the same envelope, which was received on July 22, 2011. However, the singular letter did **not** address GCC-11-REG-00544, but only the later of the two:

> A review by this office of Grievance Log #GCC-11-REG-00572 revealed that your grievance does not meet the criteria for a Level III response.
>
> In accordance with Operating Procedure 866.1- Offender Grievance Procedure, only grievances challenging the substance or interpretation of Division Operating Procedures are appealable to Level III.
>
> The Regionsl Director provided you with a response and final review on June 28 [for 00572 and 27th for 00544], 2011.
>
> Therefore, you have exhausted all administrative remedies. I am returning your grievance[s] to you for your record.

23. Over and above the grievance procedure, in October of 2011, Grethen provided to Chaplain Paul A. Beighley a **Request for Approval of Faith Object**, with the **Item Requested**: "Heat and eat Jewish Orthodox Kosher Meals," with Statement of Need:

> The VaDOC Common fare Diet DOES NOT meet the sincerely held Jewish religious beliefs that I practice. At best, some of the Common Fare is PARVE, but it is NOT prepared in a Kosher Kitchen, and not Rabbinically blessed. **Nothing is Kosher-for-Passover.**

The **Description of Item** was directed to what was already known within a Virginia Department of Corrections' policy and procedure, restricted from inmates:

> VaDOC is presently serving a Kosher Diet at the Buckingham Correctional Center that would meet my sincerely held religious beliefs, with the possible exception of the **Kosher-for-Passover** foods. However, I have neither been provided an application for Jewish Kosher Diet or transfer to Buckingham.

24. Unfortunately, Chaplain Beighley wouldn't forward the **Faith Object** request to the warden for his "Part II - Facility to Complete" review, nor were the results of the Faith Review Committee readily available at GRCC. It would not be until August of 2012 that Chaplain Beighley would admit to Grethen that he had never forwarded to form. Part of the delay was due to Grethen's temporary departure, April 24 to July 27, 2012, from the S2 compound.

25. Once aware, Grethen provided the **Faith Object** request to Warden Benjamin A. Wright, who forwarded it to the Faith Review Committee, without providing Grethen a copy of the Part II decision. The Faith Review Committee would never provide to Grethen a Part III - Faith Review Committee to Complete response either.

26. Informal complaint, GCC-13-INF-00160, which was delayed in logging, January 3, 2013, sets forth the ultimate findings of the Faith Review Committee:

> On Wednesday, December 12, 2012, upon my inquiry (i.e., I received no written notice) to Chaplain Beighley, I was directed to the Faith

- 39 -

Review Committee Action, October 23, 2012, listing:
**"60 Kosher Meals - No Action"**
I am on the Common fare Diet, which DOES NOT meet my **"sincerely held
religious beliefs,"** and is commonly violated by VaDOC (i.e., food short-
ages, improper cleansing trays, etc.). **"No Action** does not resolve the
matter of providing me with **heat & eat kosher meals** available at Buck-
ingham. (emphasised in blue ink in original).

No assistance would be provided from Ms. B. Beckett, Institutional Programs Mngr.
("IPM") in acquiring the written responses of the Faith Review Committee. A letter
to Mr. L. Cei would receive no response.

27. Grethen attempted to grieve I/C # GCC-13-INF-00160, for a resolution: "provide
the completed, **Part II and III**, Request for Approval of Faith Object, so I can pro-
perly grieve decision," which was GRCC tag-team denied by Ms. Kay Whitehead and Ms.
Shirley Tapp, on January 11 and 16, 2013. The first for insufficient information,
to which when provided, the later for "this issue in the grievance is different
from the issue in the informal complaint." The decision would upheld, January 24th,
by Ms. R. Woodson at the Eastern Regional Office ("ERO") for Mr. David B. Everett,
Regional Director (replaced A. David Robinson).

28. The above tag-team approach at GRCC would drastically decrease the number of
grievances being logged annually, to less than half of recent years. As of April 5,
2013, when Grethen's last grievance was logged, the grievance number was, GCC-13-
**REG-00188,** and the targeted logging for all of 2013 was approximately seven hundred
twenty five (725) for a population exceeding three thousand five hundred (3,500). A
simple math equation holds the evidence: 365 (annual) divided by 95 (31 (Jan) + 28
(Feb) + 31 (Mar) + 5 (Apr)) times 188 (grv. #) equals 722. The same held true for the
May 1, 2013, logging of GCC-13-REG-00239, 365 divided by 121 times 239 equals 720.
It is **no accident** that a college educated business major, who owned and operated
two successful corporations, can not get his grievances logged. See **Grv. Proc. Exh.**

29. Had the I/C # GCC-13-INF-00160 been permitted to have matured to a grievance,
that decision would have been permitted to be appealed to Level III, per OP 866.1
VI. (C)(3)(c)("Grievances regarding decisions of the Faith Review Committee are
appealable to the Deputy Director of Operations directly from Level I.").

30. On January 8, 2013, Grethen would again attempt to exhaust VaDOC **Request for
Approval of Faith Object** forms, again including "Kosher for Passover Foods / Meals
(Main Line & C/F)" along with five (5) other Jewish related matters. This time the
forms were sent directly to Mr. Tracy Ray, Warden of Adult Development / Programs,
who returned to GRCC on January 11, 2013, after his Christmas vacation. When there
was no timely response, Grethen wrote I/C # GCC-13-INF-00804, which was logged on
January 29, 2013. The February 13, 2013, response was hand delivered by the shift
captain. Very unusual.

- 40 -

31. Warden Ray's response concerning the six (6) Faith Object request forms was typical of the GRCC schuffle:

> Mr. Grethen, I was away from the inst. during last part of Dec 2012 through Jan 11 2013. I am no longer Warden of Adult Development / Programs so the items you reference have been given to Warden Boehm. **I personally handed the documents to him.** (emphasis added).

But for carbon copies retained by Grethen, there would be no record of the Faith Object request forms, as neither they or supporting attachments were returned.

32. In addition to the above Kosher-for-Passover Foods / Meals (Main Line & C/F), para. 30, the remaining **Request for Approval of Faith Object** forms were for:

Edible Seder Plate Foods for ALL Passover Participants

Passover Time / Length Modification to OP 843.1, Attachment # 2

Sabbath Jewish Service Time Added to OP 841.3

Additional Jewish Fast Days Authorized by OP 841.3

Kosher Food Vendor

The importance of these addition Faith Object requests will be relevant within the remaining religious based claims herein.

33. The failure to process the Faith Object forms resulted in GCC-13-REG-00092, which was UNFOUNDED based on the following Level I response; on March 7, 2013:

> **An investigation into your complaint indicates** that this grievance is governed by G[RCC] Offender Orientation Manual which states Request forms should be completed by the offender and forwarded through institutional mail to the appropriate person or department. Seven (7) working days are allowed for Staff to respond to request forms.

> Further investigation reveals that you directed your Request to Warden T. Ray; however, the appropriate staff member to respond to your request was Warden Boehm. **Warden Ray delivered the documents to Warden Boehm** instead of sending them back to you in order that further delays did not occur. Your grievance is therefore being ruled as Unfounded. (emphasis added to second para.)

34. Despite the fact that Warden Boehm did not return the Faith Object forms with the "Part II - Facility to Complete" or respond to the attached request form, Kay L. Whitehead's Level I reasoning, approved by Ms. V. M. Washington, Ass't Warden, would be upheld at Level II Regional review, by Ms. R. D. Woodson, and signed by Wendy S. Hobbs / SSG, Regional Administrator, on April 3, 2013, as follows:

> An investigation into you claim did not reveal evidence to overturn the Level I respondent. Per the Offender Request Form Directors # 4, request may be returned unanswered if addressed to the wrong department or if duplicate requests are sent.

In addition to the non-return, it should be mentioned that nowhere does Warden T. Ray say that he was not the appropriate party at the time the request was written on January 8, 2013. GRCC does not issue a prisoner newsletter updating changes in GRCC staff and security assignments.

## JEWISH AUTHORITIES

35.  While this claim is directed towards the Kosher-for-Passover violations, the **Ninth Cause of Action** addresses the broader issue, that the VaDOC does not provide a Kosher diet to inmates outside of the Buckingham Correctional Center ("BKCC"). A more defined set of Kosher Dietary Laws are found within the later claim.

36.  The quote from the "Complaint Alleged" at the opening of this claim came from the annual publication of the Aleph Institute Calendar, **"A Very Abridged Guide to Kosher Dietary Laws (an introductory overview only!),"** as follows:

### PASSOVER FOODS

> In addition to all of the above, the following products and their de-
> rivates may not be used during the Jewish eight-day holiday of Passover:
> wheat; rye; barley; oats; spelt; corn; legumes (soy, peanut, etc); rice;
> mustard; alcohol; beer; dextrose (from wheat or corn); sorbitol (Sephadic
> Jews do not eat some of these items). As a general rule, Passover pro-
> ducts may not be manufactured with, cooked or served in utensils that
> were previously used with non-Passover foods. All products that require
> Passover certification must be manufactured under Rabbinical supervision.
> Matzo available year-round is generally leavened and is not kosher for
> Passover.

37.  Published on the cover of the annual calendar is a "Notice to Institutional Staff," citing, in part:

> This calendar is an essential religious item for Jewish inmates to
> exercise their constitutionally-protected right to practice their
> religion [] and additional copies are available at no charge from
> Aleph for institutional staff or chaplains.

This includes Dr. Louis B. Cei, who recently received the **Head Chaplain of the Year** award from the Aleph Institute, published in the Summer 2013 **National Liberator.**

38.  As such a distinguished honoree, Dr. Cei is without excuse for being unaware of the practices and tenants of the Jewish faiths, regardless of Orthodox, Reform, Conservative, Messianic, etc., or a combination thereof. **Doublely** so when all will observe the Passover in the same time frame, with similar food restrictions.

39.  The following decision granting injunctive relief to restore a kosher diet, **Kuperman v. New Hampshire DOC**, 2007 U.S.Dist. LEXIS 32859, 06-CV-420-JD (U.S.D.Ct. N.H., April 18, 2007), cites the spiritual importance of a kosher diet:

> Removing an orthodox jew from a kosher diet serves, religiously speaking,
> **to distance an inmate from his own spirituality and religious practice.**
> It is **not**, in other words, a neutral act. Such a move has a **direct nega-
> tive impact on the inmate's ability to better himself or maintain himself
> spiritually**, as actual harm is done to **both the physical being and the
> spirituality** of the inmate. ... [S]ome Talmudic scholars teach that fail-
> ure to maintain kosher laws **can permanently damage a spiritual practice.**
> (emphasis added).

40.  **If** the above applies to everyday Kosher diet observances, **then** how much more

- 42 -

during the High Holoy Days of Passover / Pesach, when, Grethen is deprived of the Kosher-for-Passover meals by the defendants. Is this not compounded by defendants when they failed to permit third-party purchases of Kosher-for-Passover foods from the Aleph Institute? See **Tenth Cause of Action**.

41. The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), designed to protect "[Grethen's] sincerely held religious beliefs," does not require that he have the seal of approval from the defendants, chaplains, GRCC stafferes, or even the Aleph Institute (which has told Grethen he can not complete his conversion inside prison, due to requirements of Mitvah and ritual circumcision), an Orthodox authority, to illustrate that he practices his Hebrew / Israelite / Jewish beliefs, as set forth in the Torah (instruction in righteousness) written by Moshes.

42. Regarding the Mitvah and circumcision, these are security concerns of VaDOC, not the Aleph Institute, which nonetheless has corresponded with Grethen for over a decade. It is not they that have challenged Grethen's sincerely held religious beliefs. In fact, if Grethen were a free man, Aleph Institute would have long ago recognized Grethen as a full Jew, by its Orthodox conversion standards. Despite this, Aleph has been supportive with free pamplets, books and a kippah. Further, they sold Grethen his **Stone Edition Tanach, Siddur** and the **Kitzur**, and other books over the years. They have twice filled a Kosher-for-Passover order, most recently in February 2013, only to have VaDOC defendants return / derail the receipt. Also, in addition to the above materials, Grethen reads the **Zohar** and is a student of the **Kabbalah Research Institute**.

### Supporting Religious Beliefs

43. The arguments, herein this claim and below, are not limited to this claim, as they extend to the remaining religious based claims hereafter.

44. Are not the volumes of complaints and grievances, refusals to accept the non-Kosher-for-Passover meals, repetative weight losses, letter writing campains (even resulting in a June 20, 2013, 244 (Unauthorized use of facility supplies - equipment or machinery) Disciplinary Offense, for a legal letter to Congressman Eric Cantor, a Jew), and this litigation, testimony of Grethen's **actions** towards his beliefs?

45. According to Rabbi Benjamin Blech, in his video series, **Understanding Judism**, it is the action that distinguishes Judism from belief based religions. Is this not best seen in that **2/10 of 1%** of the worlds population holds over **20% of Nobel Prizes**? Or that 3/4 of the students killed a Kent State were Jewish? Action!

46. Grethen's actions at Passover 2012 resulted in an assault by Lt. Duane Taylor just after Grethen had left Rodney W. Younce's office, where he had instructed Ms. Branch to feed Grethen Kosher-for-Passover foods, based on the **founded** grievance

- 43 -

from 2011. See Claim opening. Shortly thereafter, Lt. Taylor would have Grethen locked into isolation in Housing Unit 10, on a trumped up charge, later dismissed. 47. The 2012 Passover incident with Lt. Taylor was memorialized within a letter to defendant A. David Robinson, on April 30, 2012, while Grethen was in isolation, where he refused to eat, just as the defendants had refused to feed Grethen during Passover - **twenty-two** out of **twenty-eight** meals. The six (6) received were still **not** Kosher-for-Passover. The letter, in part, reads:

RE: Lt. Duane Taylor Assault
    Starvation Diet Phase Three

Dear Mr. Robinson:

Good morning and Shalom. May you continue receiving the blessing of your new post. By the time you receive this letter, I will be on phase three (3) of my starvation diet that will halt for one (1) meal at lunch and resume at dinner. My second meal out of eighteen in H/U 10 will **still be less than EIGHTEEN (18) straight meals I was denied during Passover** 2012 (4/6-14), where I only received **six (6) meals in nine (9) days**. This is **AFTER** I won GCC-11-REG-00544 for not feeding me for nine (9) days in Passover 2011. **Your** Level II response neither resolved the issue, or gave me permission to go to LEVEL III (I went anyway). None-theless, it was **FOUNDED**.

The failure to resolve my Passover 2011 grievance set the **volatile tone** for Passover 2012, including Lt. Taylor's April 11, 2012, physical as-sault on me in the south-side S2 Chow Hall at lunch, which I recorded in Emer. Grv. # 010741. Taylor pressure point gripped my left shoulder and pulled me upwards from a squatting position with my back to Taylor, from the serving window where I was requesting my "Kosher-for-Passover" tray. I had just left Ass't Warden Younce's office where he told Ms. Branch she had to feed me "Kosher-for-Passover." That would **only** happen the next day at lunch and **only** because I showed Capt. Rowe the letter from Attorney Jeffery E. Fogel. Check chow hall camera from April 11. ... (emphasis added).

As usual, Grethen would not receive a response from Mr. Robinson. Grethen's father had even computerized the letter (in addition to handwritten) from carbon copy. 48. On Thursday, June 13, 2013, after more than three (3) years on GRCC, Grethen was **finally** provided his exhausted grievances from previous VaDOC institutions, including those addressing Passover, where he had previously been: threatened with strip cell isolation for refusing to eat **non**-Kosher-for-Passover; received a 205 (Delaying, hindering, or interfering with an employee in the performance of duties) Disciplinary Offense, for requesting Kosher-for-Passover trays; and harassed in a varity of forms. These are nothing more than historical documents, **time-barred** by by willful withholding until the statute of limitation passed. However, supporting **Ex Parte Young**, 209 U.S. 123 (1908)(ongoing continual violation of federal law). 49. Grethen's **twelve-year-old headache** and myoclonic seizures / epilepsy impede his ability to recall vast detail from memory, without his legal documents / grievances.

50.  Grethen's first acquaintance with A. David Robinson was at the Sussex II State Prison ("SXII"), in lockdown status <u>during</u> Passover of 2009, when Mr. Robinson and David B. Everett (then Warden) were making rounds, at which time Grethen complained that he was not being provided any foods that he could eat, as <u>none</u> were Kosher-for-Passover (Grethen was refusing his trays), Robinson stonewalled.

51.  Concluding a brief contentious exchange, wherein Robinson knew <u>not</u> to whom he spoke, related to being deprived <u>all</u> meals for nine (9) days, he concluded with, **"you got a good attorney?"** Robinson and Everett then walked a few cells away, and Robinson returned, saying, "So you're Grethen." We talked again briefly. When we have spoken of litigation since, he's stated, **"just spell my name right."** Arnold.

52.  Robinson, then East. Reg. Dir., and designees, would then go on to separate **ALL** previously exhausted grievances from Grethen, upon transfer to GRCC, for **three years**. Making malicious harm and Anti-Semitic treatment towards Grethen during Passover of 2011, 2012 and 2013, even more egregious, when losing 15 lbs. in 9 days in 2013.

53.  Former GRCC wardens, Hinkle and Wright, assured Grethen's grievance limits, in 2012 and 2013, prohibited him from having Passover grievances assigned log numbers. Yet, the informal complaints and denials at intake process<u>es</u> exhausted **"available"** administrative remedies required of Prison Litigation Reform Act.

54.  Nonetheless, with **ninety (90%) percent** of Grethen's logged complaints suffering denial of <u>logged grievance</u> numbers by Kay Whitehead and Shirley Tapp, there a **bold statement** that the GRCC grievance process is no longer complaint with **28 CFR, Chp I, Part 40** (Standards for Inmate Grievance Procedures), **Subpart A** (Minimum Standards for Inmate Grievance Procedures), which require certification of a **State's** grievnace system by the Attorney General of the United States:

> If the Attorney General finds that the grievance procedure is **not in substantial compliance** with the standards promulgated herein or is **no longer fair and effective**, the Attorney General **shall deny** certification and inform the applicant in writing of the area or areas in which the grievance procedure or the application is deemed inadequate. § **40.16 Denial of Certification** (emphasis added).

Most of Grethen's **logging denied** (therefore **no** medical review) concern issues of his myoclonic epilepsy and organic brain damage. This is **not** a medical related claim. Whitehead will only <u>log</u> **725** grievance of **10,000** complaints for **3,500** inmates, 2013.

55.  Finally, Grethen contends that **repeated cyclical** deprivations of Kosher-for-Passover foods (knowing Grethen will not eat / has nothing to eat) for nine (9) days was **cruel and unusual punishment**, in violation of the Eighth Amendment. See <u>**Jones v. Superintendent**</u>, 370 F.Supp. 488, 493 (W.D. Va. 1974), to-wit:

> [T]his court **will not countenance** depriving an inmate ... **same caloric** content as received by other ... inmates by **knowingly serving him** foods **that he will reject**, at least when the rejection is **based upon** arguably religious grounds. (emphasis added).

56.   Having just received, on June 13, 2013 (and having to return on June 17), the previously exhausted grievances and legal material **withheld for three (3) years**, a revisit is noteworthy. The following was only acquired through court order, in the matter of **Blankenship v. Bass, et al.**, Civil Action No. 2:03-CV-850 (U.S. Dist. Ct. E.D. Va.) whereupon Gene M. Johnson, former VaDOC Director, had to disclose Common Fare policies, previously withheld from inmate population. **PROCEDURE NUMBER: 611**, **DATE**: October 16, 1996, was faxed on/from "05/03/2004 09:31 DOC DIRECTOR OPERATIONS > 97864239 NO. 068" as the result of discovery. Grethen had filed an affidavit in support of Blankenship.

57.   Within the above ¶ 56, policy is a **Page-4 January 24, 2000**, addition to the October 16, 1996, signed (by Gene M. Johnson) document, with section 611-7.10, the **ANNUAL CEREMONIAL MEALS**:

> The assistant Warden of Programs **should** provide the Food Service Manager   = at each institution with a schedule of the Ceremonial meals for the up-coming calendar years, including the date (when known), religious group, estimated number of participants and **any required special food purchases**. Each ceremonial meal plan should be finalized **approximately four weeks prior to the event**. (emphasis added).

NOTE: VaDOC defines "should" within OP 001.1, Attachment #1 (11)(Language and Gram-mar), as "Should is used to express the will to have something take place in the future, or when a certain action is expected **but not necessarily required**." (added emphasis). Hence, **by design** this policy was meant to be violated.

58.   Supporting the intent to violate, ¶ 57, Grethen illustrates that **every** policy since the above has knowingly, willfully, and intentionally **deleted** this language. The injury to Grethen, annually, is stated within ¶¶ 1-55 of this claim, as VaDOC defendants fail to provide Kosher-for-Passover **"Annual Ceremonial Meals."**

59.   Every subsequent policy revision to Common Fare includes "NOI/Month of Fasting Menu"; "Obversance of Ramadan": "Month of Fasting"; and "EID UL FITR" meal planning and NOT prohibited foods, have no **equal protection for Jewish Passover** observances.

60.   In recent years, due to successful litigation by **William R. Couch** and **Leroy A. Lovelace**, Orthdox and NOI, respectively, Muslims, the VaDOC has begun feeding the EID UL FITR **Feasts** to the **entire** VaDOC prison population, Thirty-Five Thousand plus. Obviously **EXPENSE is NOT** the issue concerning Kosher-for-Passover meals to a **small handful** of Jewish inmates.

61.   Further, religious meals, NOT mentioned within any **Religious Diets/Common Fare Meals** policy and/or **Food Services Manual Chapter** 4, are provided annauly to the entire inmate population during **Thanksgiving** and **Christmas**, yet a Messianic Jewish inmate on Common Fare is prohibited from these meals, but not EID UL FITR. Biased policies towards Muslims is obvious, yet **both** they and Hebrew / Jews are Semitic.

- 46 -

## EIGHTH CAUSE OF ACTION
### (Arbitrary Removal from Religious Diet - Fast of Esther)

**07/12/11**  GCC-11-REG-00426 Unfounded; Failed to respond at Level III (Richmond)

**06/06/11**  **Level II Unfounded, upholding WRONG citation of policy:**
"In your grievance, you claimed that on March 12, 2011, your Jewish Fast of Esther dinner tray was **not in compliance with your religious beliefs and the Common Fare** agreement as it was pork and no replacement tray was provided. An investigation into your claims did not reveal evidence to overturn the ruling of the Level I respondent." (emphasis added)

**05/18/11**  **Level I  Unfounded, citing PASSOVER MEALS policy**
"... Changes - The planned **Passover Observance** will not be changed at the facility level. Offenders celebrating Passover can eat from the **regular serving line** with the exception of matzo substituting for bread. Offenders desiring to observe Passover should make their intentions known in writing to the Facility Unit Head of designee **at least 30 days prior to the beginning** of Passover.

Further investigation has revealed that per R. Abernathy, Food Operations General Manager, **turkey salad was served** for that meal; pork was not served. You have presented no evidence to support your allegation that you were served pork for that meal." (emphasis added)

**Parties:**  John M. Jabe, DOC Deputy Director; Ron Abernathy, former GRCC Food Op. Gen. Mngr.; Dana Y. Kinsley, GRCC Grievance Office; V. M. Washington, GRCC Ass't Warden; Renee Woodson, ERO Ombudsman; A. David Robinson, former ERO Dir.; and Canteen Correctional Services, former GRCC Food Services Contractor.
NOTE: VaDOC may have to exercise substitution of parties for claim.

**Complaint**  "On Thursday, March 17, 2011, for the Jewish Fast of Esther, the
**Alleged**  DINNER tray did not arrive until 10:15 PM (Fast Ended at 7:58 PM) as C/O Lyons and Sgt. Forbes had **no documentation as to the Fast.** Moreover, the DINNER tray served was **not complaint** with my 'sincerel held religious beliefs' and my **Common Fare** agreement, as it was PORK. No replacement tray was provided, so I had NO post-FAST dinner tray." (emphasis added).

**Response**  NONE: There was no response received for complaint GCC-11-INF-02203

### Facts Related to Eighth Cause of Action

**1.**  This is an annual problem in the VaDOC, having occurred to Grethen both prior and since 2011, as until recently, OP 841.3 **Offender Religious Procedure**, did not specifically address the Jewish Fasts, in the previous January 1, 2009, version, but for briefly in Attachment 7, **Master Religious Calendar**, which was not available in the GRCC S2 Law Library, despite filing a grievance to have it produced. It was not until the March 1, 2012, revision of OP 841.3 that the **Master Religious Calendar** (Attachment # 2) would be made available in the GRCC S2 Law Library.

**2.**  While the Master Religious Calendar contains the Fast of Esther, it does not contain most of the Jewish fasts, nor does is include the weekly Sabbath (Friday sunset to Saturday sunset). No weekly service is listed for any religous group.

- 47 -

3.   Dr. Louis B. Cei, VaDOC Operations Support Manager, takes pride in creation of the **Master Reglisious Calendar** and has been known to brag of such with national Messianic Jewish magazines, such as **Petah Tikvah**, Vol. 30, No. 3, page 36:

> **Dear Rabbi Chaimberlim -**
>
>    I provide all of the prisons with a detailed religious calendar each year, which includes express instructions for how to handle each special holiday meal. Our Jewish offenders receive all the required elements to mark their significant religious holidays. Our Common Fare diet is con- sidered to be religiously appropriate for our Jewish inmates.
>
> Louis Cei, Ph.D., Programs Manager, VIRGINIA (July 2012)

Not only does Grethen's **Seventh Cause of Action** disagree with Dr. Cei's assertion that Common Fare is a substitute for Kosher, this claim illustrates that the DOC theory of "trickle-down" does not apply at GRCC, as there is **no** VaDOC rabbinical authority contact for Grethen to lodge his complaints.

4.   Grethen has been on the Common Fare diet since November 2004, continuously, when permitted. See below. The Common Fare assignment is made available through a statewide VACORIS computer system, and was available to GRCC kitchen staff on the 12th of March, 2011, when breaking the Fast of Esther. Nonetheless, at **10:15 PM** (fast ended at 7:58) the dinner tray that was provided was not Common Fare, but a general population tray containing **PORK**.

5.   When GRCC serves pork it posts signs in the kitchen and on the front doors of the chow hall, as it had done on the day in question. Grethen was also housed with kitchen workers, that had said that the meal was pork. This is really a secondary issue, as the primary issue is that GRCC is **never** prepared for the Jewish fasts, either pre or post-fast meals. In the three (3) years that Grethen has been on the GRCC compound, there has **never** been a posted memo on the inmate bullentin boards for upcoming Jewish programs, while hundreds have been posted for both Christian and Muslim programs. This results from **no** Jewish clerks in the GRCC chapel.

6.   Then, effective date January 1, 2009, OP 841.3, Attachment **7, Master Religious Calendar**, provided for the following Holy Day, Fast of Esther:

| Dietary Considerations (General Population Only) | Religious Services, Items Required & Other Information (General Population Only) |
|---|---|
| Breakfast meal to be provided before sunrise and dinner meal to provided after sundown. **No pork.** The fast is from sunrise to sunset. (emphasis added) | Jewish, Messianic Jewish, and Yahist inmates may hold a special worship/prayer service on this date; day or evening. |

7.   The current **Master Religious Calendar**, OP 841.3, Attachment 2, effective on March 1, 2012, contains the very same headings and instruction, but for "begins at sundown on the day preceding," under **Holy Day** heading.

- 48 -

8.    There is <u>no</u> instruction for the removal of an inmate from the Common Fare diet on the Fast of Esther, or the substitution of a "regular serving line" for religious diets. Yet, Grethen was removed for BOTH the breakfast and dinner meals.

9.    Likewise, there is no instruction that Passover Holy Day requires, see **Seventh Cause of Action**, are substitutions for the <u>Fast</u> of Esther, especially when Passover is a **FEAST**. Nonetheless, Ms. Dana Y. Kinsley, in addition to the above cited Level I response at the opening, had concluded that:

> **An investigation into your complaint indicates** per [DOC] Foods Service Manual, chapter 4, Religious Diets/Common Fare Meals, the **Passover religious observance meals** provide a religious diet that reasonably accommodates certain religious or spiritual dietary needs to the extent feasible during **Passover**. Religious dietary accommodations provided under this procedure meet basic nutritional needs. **Passover** religious observance meals are available only to offenders who require special religious diets during **Passover** and are for accommodating their sincere religious practices. ... (empahsis added)(FSM, Chpt. 4, § VII (A) and (B)).

Such an excellent quote to consider when examining why it is that Grethen has lost weigh, repeatedly, during Passover. Most recently, fifteen (15) pounds, in 2013.

10.    Noticeably absent from Ms. Kinsley's mis-citation of FSM, Chpt. 4, concerning Passover, is subsection VII., at C:

> C. A memorandum will be sent from the Deputy Director, Division of Operations annually to notify facilities of the dates of Passover.

There had been no memorandum from VaDOC Richmond instructing the local facilities to substitute Passover FEAST requirements for the Fast of Esther. And, had there, why was not Grethen served Matzo, which is the <u>ONLY</u> Passover change recognized by the VaDOC presently. See **Seventh Cause of Action**, ¶¶ 1, 5, 11, 15 and 17.

11.    As usual, Ms. V. M. Washington, GRCC Assistant Warden, approved and signed, on May 18, 2011, the Level I response to GCC-11-REG-00426, as is her habit for entire times that Grethen has been at GRCC. Grethen appealed the decision to the Eastern Regional Director on the same date, citing the following:

1) There is <u>no</u> mention of the Fast of Esther in Food Service Manual Ch 4;

2) My grievance does <u>not</u> address Passover;

3) I did <u>not</u> request that I be removed from Common Fare and served a general population tray of any kind;

4) Neither - PORK or **"turkey salad"** are served on the Common Fare Diet:

5) Attached is a March 17, 2011, request showing **"at 10:15 PM C/O Lyons left a RED TRAY in my cell,"** [I was in the shower] while the Common Fare trays are **BLUE**;

6) That request also shows I reported the matter and **"I did not eat,"** as no replacement was served me;

7) Also attached is I/C #s 01982, 01980, 02047, an UNNUMBERED I/C, Emer. Grv. # 033254 and a limited returned attempt to grievance **ALL** of which show that on two other occasions that same week **(BOTH MORNING AND DINNER**

- 49 -